**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TEAMSTERS LOCAL 237 RETIREES' BENEFIT FUND and TEAMSTERS LOCAL 237 WELFARE FUND, <br><br> Plaintiffs, <br><br> v. <br><br> PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; PURDUE PHARMACEUTICAL PRODUCTS L.P.; PURDUE PRODUCTS L.P.; CEPHALON, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS INC.; ENDO INTERNATIONAL PLC; MALLINCKRODT PLC; MALLINCKRODT PHARMACEUTICALS; INSYS THERAPEUTICS INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; and MCKESSON CORPORATION, <br><br> Defendants. | Civil Action No. <br><br><br><br> **COMPLAINT** |

- 1 -

## I.    INTRODUCTION

1.    Plaintiffs Teamsters Local 237 Retirees' Benefit Fund and Teamsters Local 237 Welfare Fund ("Plaintiffs" or the "Funds"), bring this action against defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Inc., Purdue Pharmaceutical Products L.P., Purdue Products L.P., Cephalon, Inc., Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals Inc., Endo Pharmaceuticals Inc., Endo International plc, Mallinckrodt plc, Mallinckrodt Pharmaceuticals, Insys Therapeutics, Inc. ("Manufacturer Defendants"), and AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation ("Distributor Defendants") (collectively, "Defendants").

2.    Local 237 Teamsters is the largest local in the Teamsters international union, the International Brotherhood of Teamsters.  The membership of over 24,000 consists of New York City employees who work in government agencies and several municipalities on Long Island. About 7,400 Local 237 Teamsters members work for the New York City Housing Authority, 11,000 members work in New York City agencies, the Health and Hospitals Corporation and the City University of New York, and approximately 3,000 members work on Long Island. Members include public safety officers, uniformed services, building and ground keepers, skilled trade persons and cleaners.  Local 237 Teamsters also represents over 8,000 retirees, ranging in age from 35 to 95.  Just fewer than 90% are men.  Approximately 85% reside in the New York metropolitan area.

3.    The Local 237 Welfare Fund was established in March 1964 by the Executive

Board of Local 237 in order to provide additional supplementary benefits to Local 237 working and retired members in the Citywide and Housing Divisions.  The Fund is a separate trust, outside of the Union, which has its own Board of Trustees.  These Trustees have responsibility for carrying out the purpose of the trust by providing as many benefits to the participants as are economically and fiduciary possible.  The Local 237 Retirees' Benefit Fund provides supplementary benefits to members, retirees, and their families.  The Funds provide healthcare for the union's members and their eligible dependents including, but not limited to, catastrophic medical, vision care, dental care, and prescription drug benefits.  The prescription drug benefit pays most of the costs of prescription drugs.  Most of the Funds' participants are residents of the State of New York, which, like many states across the country, is facing an unprecedented opioid and fentanyl addiction crisis.

4.     Opioids are a class of drugs that include legal prescription pain medications such as oxycodone, hydrocodone, codeine, morphine, and fentanyl, as well as the illicit drug heroin.[1] Prescription opioids include brand-name drugs like OxyContin, Duragesic, Opana, Subsys, Exalgo, Rocidonone, Actiq, Fentora, and Xartermis, as well as generic drugs such as oxycodone, codeine, morphine, and hydrocodone.  They are derived from or possess properties similar to opium and heroin and, as such, are highly addictive and dangerous.  Accordingly, they are regulated by the United States Food and Drug Administration ("FDA") as controlled substances.

5.     The FDA is responsible for development, implementation, and enforcement of federal drug policy in the United States.  By way of the 1970 Controlled Substance Act ("CSA"), the FDA released classifications and schedules that organized drugs into groups based upon risk of abuse or harm.  There are five schedules ranging from Schedule I to Schedule V.  Schedule I

---

[1] *See Opioid Addiction Facts & Figures*, American Society of Addiction Medicine, 2016.

drugs are classified to have no currently accepted medical use and a high potential of abuse, which includes heroin and lysergic acid diethylamide ("LSD"). Schedule V drugs are classified as having the lowest potential for abuse. Opioids are classified within Schedule II.

6.      According to the United States Drug Enforcement Administration ("DEA"):

> Schedule II drugs, substances, or chemicals are defined as drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence. These drugs are also considered dangerous. Some examples of Schedule II drugs include combination products with less than 15 milligrams of hydrocodone per dosage unit (Vicodin), cocaine, methamphetamine, methadone, oxycodone (OxyContin) and fentanyl.[2]

7.      Opioids provide effective treatment for short-term, post-surgical, and trauma-related pain, as well as for palliative end-of-life care. They are approved by the FDA for use in the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days. Defendants, however, have manufactured, promoted, and marketed opioids for the management of pain by misleading consumers and medical providers through misrepresentations or omissions regarding the appropriate uses, risks, and safety of opioids.

8.      In 2015 alone, 33,000 people died from opioid overdoses and 2 million people had substance abuse disorders related to opioids.[3] From 1999 until 2015, more than 183,000 people in the United States died from overdoses directly related to prescription opioids.[4] The overdose rates, however, were higher among people between the ages of 25 and 54.[5] Similar to tobacco use, the use of opioids is beginning at a much younger age. Non-medical use of opioids has become increasingly problematic in recent years, with increases in treatment admissions,

---

[2] *Drug Schedules*, Drug Enforcement Administration, https://www.dea.gov/druginfo/ds.shtml.

[3] *See supra* n.1.

[4] *Prescription Opioid Overdose Data*, Center for Disease Control and Prevention, www.cdc.gov/drugoverdose/data/overdose.html.

[5] *Id.*

overdoses, and deaths.  Opioid use has also contributed to heroin initiation, which has increased in recent years because it is the less expensive of the two options.  A survey conducted by the Monitoring the Future Study of 67,882 high school seniors from 2009 to 2013 showed that 12.4% of students reported lifetime non-medical opioid use and, as the frequency of lifetime non-medical opioid use increased, so too did the odds for reporting heroin use, with over three quarters (77.3%) of heroin users reporting lifetime non-medical opioid use.[6]

9.     Over the last decade, addiction to prescription opioids[7] reached crisis levels, spawning a massive economic and social burden that costs the United States economy approximately $78.5 billion per year, according to a study published by the U.S. Center for Disease Control ("CDC") (the "CDC Study").[8]  "More than 40 Americans die each day from overdoses involving prescription opioids.  Families and communities continue to be devastated by the epidemic of prescription opioid overdoses," said CDC Director Dr. Tom Frieden.  "The rising cost of the epidemic is also a tremendous burden for the health care system."[9]  The CDC Study considered how the opioid epidemic affected the U.S. economy in 2013.  The Study found that more than 30% of the annual $78.5 billion costs were due to increased health care and substance abuse treatment costs.

10.     Unlike earlier opioid abuse epidemics, the present crisis is disproportionately affecting white, middle-class people in non-urban settings, including those with private

---

[6] *Nonmedical opioid use and heroin use in a nationally representative sample of US high school seniors*, Drug and Alcohol Dependence, http://www.drugandalcoholdependence.com/article/S0376-8716(15)01747-0/fulltext.

[7] *Id.*

[8] *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013*, LLW Journals, Medical Care, vol. 54, no. 10, October 2016.

[9] *Opioid Epidemic Costs U.S. $78.5 Billion Annually: CDC*, HealthDay News, September 21, 2016.

health insurance.[10] Because the demographics of opioid abuse have changed from earlier epidemics, the effects of the current wave can be traced in private health insurance claims.[11]

11.     Private health insurance claims with an opioid dependence diagnosis rose 3,203 percent from 2007 to 2014.[12] The national aggregated dollar value of charges for opioid-related diagnoses, as well as of imputed allowed amounts for such diagnoses, rose over 1,000 percent from 2011 ($71.66 million) to 2015 ($721.80 million).[13] Those amounts represent the charges that providers billed for their procedures and services. Allowed amounts, the maximum amount an insurer will pay for a covered health service have increased by an even greater rate, 1,375 percent, during the same period, from $32.42 million in 2011 to $445.74 million in 2015.

12.     In 2015, the average costs for a patient diagnosed with opioid abuse or dependence paid by private payors like Plaintiffs were more than 550 percent higher than the per-patient average cost based on all patients' claims.[14] Private payors, like Plaintiffs, shoulder the nation's largest share of the economic burden for the opioid crisis.

13.     In 2015, a per-patient charge average (across all diagnoses and all claim types for all patients in a commercial dataset) was $11,404. That same year, the per-patient average total charge for a patient identified with an opioid abuse or dependence diagnosis was

---

[10] *The Opioid Crisis Among the Privately Insured: The Opioid Abuse Epidemic as Document in Private Claims Data,* FAIR Health. July 2016. FAIR Health, a national, independent, nonprofit organization dedicated to transparency in healthcare costs and health insurance information, consulted its database of over 20 billion privately billed healthcare claims to identify trends and patterns in the epidemic among the nation's privately insured population.

[11] *Id.*

[12] *The Impact of the Opioid Crisis on the Healthcare System: A Study of Privately Billed Services,* FAIR Health. Sept. 2016.

[13] *Id.*

[14] *Id.*

$63,356.

14.    The following graph shows year-over-year national average charges per patient for private insurance claims for all patients and for patients with opioid abuse or dependence diagnoses during the time period 2013-2015.[15]



15.    With respect to the amounts that are allowed by the insurance companies on a per-patient basis, the difference was 563 percent: the per-patient average allowed amount for all patients was $3,435 compared to the per-patient average of $19,333 for patients with an opioid abuse or dependence diagnosis.[16]

16.    The following graph shows year-over-year national average allowed amounts per patient for private insurance claims for all patients and for patients with opioid abuse or dependence diagnoses during the time period 2013-2015.[17]

---

[15] *Id.*

[16] *Id.*

[17] *Id.*



17.    The opioid crisis has become a national and local issue.  In April 2017, New York State Governor Andrew Cuomo announced that the state would be allocating over $213 million to combat the opioid and heroin epidemic[18] and stated that the epidemic was the "worst drug scourge" the nation has ever faced.  "This is worse than crack… This is worse than meth, this is worse than old-time heroin.  It's everywhere… It can seduce you *legally*, which is where a lot of it starts."[19]

18.    According to an audit released in June 2016, which was conducted by New York State Comptroller Thomas DiNapoli for the year of 2015, overdose deaths in New York related to heroin use reached a record high of 825 in 2015, a jump of more than 23 percent from the

---

[18] *Governor Cuomo Signs Legislation Investing over $200 Million to Combat the Heroin and Opioid Epidemic in New York*, NYS Governor Cuomo Press Release, (Apr. 29, 2017), www.governor.ny.gov.

[19] Glenn Blain, *Governor Cuomo announces $213 million to fight Heroin, Opioid Epidemic*, New York Daily News, Apr. 20, 2017.

previous year and nearly 25 times the number recorded a decade earlier. Deaths in which prescription opioids were a contributing factor also reached a new peak in 2014, nearly four times the level in 2005. Comparing the death rates in 2005 and 2014 for both substances, New York's increased more than almost any other state for which such data were available.[20] The number of overdose deaths in New York in which prescription opioids were a contributing cause also reach a new peak of 1,008 in 2014, which is nearly quadruple the number of prescription opioid fatalities recorded in 2005.[21]

19. The National Institute on Drug Abuse ("NIDA"), a component of the National Institutes of Health ("NIH"), has identified several factors that have contributed to the nation's prescription opioid epidemic, including the "drastic increases in the number of prescriptions written and dispensed, greater social acceptability for using medications for different purposes, and aggressive marketing by pharmaceutical companies."[22]

20. The following table shows that an estimated 582,000 New Yorkers a year used prescription pain relievers for non-medical purposes in 2013-14. This number is significantly lower than the 654,000 New Yorkers misusing prescription pain relievers in 2007-08. One factor contributing to the decrease is the efforts put forth by healthcare providers in coordination with pharmaceutical benefit managers to identify overlapping prescriptions from multiple providers and pharmacies and when members are taking high daily dosages of prescription pain relievers. Aggressive programs have been put in place, by the Funds as well; however, the financial burden of the past decade's epidemic has forced the Funds to make programming and financial decisions

---

[20] Thomas P. DiNapoli, *Prescription Opioid Abuse and Heroin Addiction in New York State*, Office of the New York State Comptroller, June 2016 (hereinafter "DiNapoli, *Opioid Abuse in New York*").

[21] *Id.*

[22] *Id.*

that are detrimental to all of their members as a way to make up the crushing costs.  In 2011, the Journal of Pain Medicine estimated that healthcare costs related to the prescription opioid epidemic amounted to $25 billion.[23]

**Estimates of Average Annual Use and Prevalence of Use  of Prescription Pain Relievers for  Non-Medical Purposes**
(usage numbers in thousands of person aged 12 or older; prevalence numbers per 100,000 population aged 12 or older)[24]

| | Usage | | Prevalence | |
|---|---|---|---|---|
| **Years of Annual Average** | **New York** | **US** | **New York** | **US** |
| 2013-14 | 582 | 10,710 | 3,443 | 3,998 |
| 2012-13 | 663 | 11,786 | 3,939 | 4,440 |
| 2011-12 | 682 | 11,816 | 4,075 | 4,493 |
| 2010-11 | 667 | 11,693 | 4,009 | 4,489 |
| 2009-10 | 714 | 12,309 | 4,301 | 4,778 |
| 2008-09 | 692 | 12,145 | 4,171 | 4,764 |
| 2007-08 | 654 | 12,176 | 3,957 | 4,818 |

21.     For too long, the public at large has been forced to contend with the deadly aftermath of the proliferation of opioids in society. Those responsible should be required to internalize the costs with which they have burdened society.

22.     Both the Defendant Manufacturers and the Defendant Distributors are responsible

---

[23] Sheelah Kolhatker, *The Cost of the Opioid Crisis*, The New Yorker, Sept. 18, 2017.

[24] Thomas P. DiNapoli, *Prescription Opioid Abuse and Heroin Addiction in New York State*, Office of the New York State Comptroller, State Comptroller, June 2016.  Citing (U.S. Substance Abuse and Mental Health Services Administration Center for Behavioral Health Statistics and Qualify for usage numbers: US Census Bureau civilization population estimates for calculation of prevalence rates.)

for the opioid proliferation. Defendants' marketing – and not any medical breakthrough – rationalized prescribing opioids for chronic pain and opened the floodgates for opioid use and abuse.

23. Defendants falsely and misleadingly, and contrary to the language of their drug labeling: (1) downplayed the serious risk of addiction from prescription opioids; (2) promoted the concept of "pseudoaddiction," and thus advocated that the signs of addiction should be treated with still more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. Conversely, Defendants also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no good evidence to support Defendants' claims.

24. Defendants disseminated these common messages to reverse the popular and medical understanding of opioids. They disseminated these messages directly, through their sales representatives, and in speaker groups led by physicians Defendants recruited for their support of Defendants' marketing messages.

25. Defendants also worked through third parties they controlled by: (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups"). Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific

articles. Thus, working individually and collectively, and through these Front Groups and KOLs, Defendants persuaded doctors and patients that what they had long known – that opioids are addictive drugs, unsafe in most circumstances for long-term use – was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.

26.     Each Defendant knew that its misrepresentation an material omission of material facts regarding the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence. Indeed, the falsity of each Defendant's misrepresentations has been confirmed by the FDA and CDC, including by the CDC in its *Guideline for Prescribing Opioids for Chronic Pain*, issued in 2016 and approved by the FDA.

27.     Defendants' efforts were extraordinarily successful. Opioids are now the most prescribed class of drugs; they generated $11 billion in revenue for drug companies in 2014 alone. In an open letter to the nation's physicians in August 2016, the then-U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[25]

28.     This epidemic, fueled by opioids lawfully prescribed by doctors, has resulted in a flood of prescription opioids available for illicit use or sale, and a population of patients physically and psychologically dependent on them. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

29.     The Distributor Defendants' violations have already led to fines elsewhere. McKesson, the largest prescription drug wholesaler company in the United States, agreed on

---

[25] Vivek H. Murthy, *Letter from the Surgeon General*, (August 2016), http:turnthetiderx.org

- 12 -

January 17, 2017, to pay a $150 million fine to the federal government for such misconduct. In December 2016, Cardinal Health reached a $44 million settlement with the federal government. One month later, Cardinal Health reached a $20 million settlement with the State of West Virginia, which has been among the states hardest hit by opioid abuse. AmerisourceBergen also recently agreed to pay West Virginia $16 million for similar violations.[26]

30.     Defendants' scheme was met with tremendous success, if measured by profit. According to *Fortune* magazine, McKesson, AmerisourceBergen and Cardinal Health are each among the top 15 companies in the Fortune 500. The Sackler family, which owns Purdue – a privately held company – is listed on *Fortune*'s list of America's wealthiest families. However, the impact of opioid addiction has devastated the nation, emerging as one of the country's, and the New York metropolitan area's major health threats. As reported by *National Public Radio*, opioid addiction is thought to be among factors contributing to the United States' increase in overall rate for mortality from 2014 to 2015, the first time in a decade that the mortality rate increased. Former FDA Commissioner David A. Kessler has called the failure to recognize the dangers of painkillers "one of the greatest mistakes of modern medicine." As alleged herein, that "mistake" resulted in large part from defendants' false and misleading messaging, which was carefully calculated to reach as many prescribers as possible, and willingness to turn a blind eye to suspicious orders.

31.     Even where some defendants have previously been forced to admit the unlawful marketing and sale of opioids and/or the failure to report suspicious orders, the conduct does not abate because profits realized by the aggressive marketing and prescribing of opioids

---

[26] Charles Ornstein, *Drug Distributors Penalized For Turning Blind Eye In Opioid Epidemic*, National Public Radio (Jan. 27, 2017), http://www.npr.org/sections/health-shots/2017/ 01/27/511858862/drug-distributors-penalized-for-turning-blind-eye-in-opioid-epidemic.

dwarf the penalties imposed as a result of violations found. Thus, the incentive to push opioids remains. The scheme was so financially successful, in fact, that despite the clear and obvious devastation it caused at home, Purdue's owners, the Sackler family, are now pursuing the same strategy abroad. As reported by the *Los Angeles Times*, Purdue states "[w]e're only just getting started," and intends to "[p]ut the painkiller that set off the United States opioid crisis into medicine cabinets around the world. A network of international companies owned by the family is moving rapidly into Latin America, Asia, the Middle East, Africa and other regions, and pushing for broad use of painkillers in places ill-prepared to deal with the ravages of opioid abuse and addiction."[27]

## II.    PARTIES

32.    The Plaintiffs, Teamsters Local 237 Retirees' Benefit Fund and Teamsters Local 237 Welfare Fund are health and welfare benefit funds ("Plaintiffs" or the "Funds").  Plaintiffs have paid and/or provided reimbursement for some or the entire purchase price on behalf of its members for prescription opioids, which were manufactured, marketed, promoted, sold, and/or distributed by the Defendants. Plaintiffs have sustained injury as a result of Defendants' illegal and wrongful conduct

33.    Defendant Purdue Pharma L.P. is a Delaware limited partnership formed in 1991 with headquarters located in Stamford, Connecticut. The company maintains four operational branches: Purdue Pharma Inc., the Purdue Frederick Company, Purdue Pharmaceutical Products L.P. and Purdue Products L.P. (referred to collectively herein as "Purdue").

34.    Defendant Cephalon, Inc. is a Delaware corporation with its headquarters and principal place of business located in Frazer, Pennsylvania. Cephalon, Inc. was acquired by Teva

---

[27] Harriet Ryan, *et al.*, *OxyContin goes global – "We're only just getting started,"* L.A. Times (Dec. 18, 2016), http://www.latimes.com/projects/la-me-oxycontin-part3/ (hereinafter "Ryan, *OxyContin goes global*").

Pharmaceutical Industries Ltd. ("Teva Ltd.") in October 2011. Teva Ltd. is incorporated under the laws of Israel with its principal place of business in Petah Tikva, Israel. Since Teva Ltd. acquired Cephalon, Inc., its United States sales and marketing activities have been conducted by Teva Pharmaceuticals USA, Inc. ("Teva USA" and, together with Teva Ltd., "Teva"), a wholly-owned operating subsidiary of Teva Ltd. Teva USA's headquarters and principal place of business are in North Wales, Pennsylvania. Cephalon, Inc., Teva Ltd. and Teva USA are collectively referred to herein as "Cephalon."

35.     Defendant Endo International plc is an Irish public limited company with its headquarters in Dublin, Ireland. Endo Pharmaceuticals Inc. (together with Endo International plc, "Endo") is a Delaware corporation with its headquarters and principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is an indirectly wholly-owned subsidiary of Endo International plc.

36.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen") (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica) is headquartered in Titusville, New Jersey and Raritan, New Jersey. Janssen is a wholly-owned subsidiary of Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

37.     Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona.

38.     Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt Pharmaceuticals (together with Mallinckrodt plc, "Mallinckrodt") is a Delaware corporation with its headquarters in Hazelwood, Missouri.

39.     Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a Delaware corporation with its headquarters and principal place of business located in Chesterbrook, Pennsylvania.

40.     Defendant Cardinal Health, Inc. ("Cardinal Health") is a Delaware corporation with its headquarters and principal place of business located in Dublin, Ohio.

41.     Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its headquarters and principal place of business located in San Francisco, California.

## III.     JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 based on the federal claims asserted under the Racketeer Influenced and Corrupts Organizations Act, 18 U.S.C § 1961, *et seq*. ("RICO").

43.     The Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in the State of New York, purposefully directed their actions towards New York, consensually submitted to the jurisdiction of New York when obtaining a manufacture or distributor license, and have the requisite minimum contacts with New York as necessary to constitutional permit the Court to exercise jurisdiction.

44.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391. This Court has personal jurisdiction over each Defendant as each purposefully availed itself of the privilege of exploiting forum-based business opportunities.

## IV.     FACTUAL ALLEGATIONS

### A.     Over the Course of More than Two Decades, the Manufacturing Defendants Misled the Public Regarding the Dangers of Opioid Addiction and the Efficacy of Opioids for Long-Term Use, Causing Sales and Overdose Rates to Soar

45.     From the mid-90s to the present, the Manufacturing Defendants aggressively

marketed and falsely promoted liberal opioid prescribing as presenting little to no risk of addiction, even when used long term for chronic pain. They infiltrated academic medicine and regulatory agencies to convince doctors that treating chronic pain with long-term opioids was evidence-based medicine when, in fact, it was not. Huge profits resulted from these efforts, as did the present addiction and overdose crisis.

### 1.    Background on Opioid Overprescribing

46.    The Manufacturing Defendants' scheme to drive their rapid and dramatic expansion of prescription opioids was rooted in two pieces of so-called evidence. First was the publication of a 100-word letter to the editor published in 1980 in the *New England Journal of Medicine* ("1980 Letter to the Editor").[28] A recent article about the letter, titled "A 5-sentence letter helped trigger America's deadliest drug overdose crisis ever," quoted a 2017 study in the *New England Journal of Medicine*, in which researchers concluded:

> [W]e found that a five-sentence letter published in the *Journal* in 1980 was heavily and uncritically cited as evidence that addiction was rare with long-term opioid therapy. We believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy.[29]

---

[28]  In 1980, the *New England Journal of Medicine* published a 100-word letter to the editor by Jane Porter ("Porter") and Dr. Herschel Jick ("Jick"), reporting that less than 1% of patients at Boston University Medical Center who received narcotics while hospitalized became addicted. Jane Porter & Hershel Jick, *Addiction rate in patients treated with narcotics*, 302(2) New Eng. J. Med. 123 (Jan. 10, 1980). However, the letter did not support the conclusion for which it was often cited by the industry. *See* Harrison Jacobs, *This one-paragraph letter may have launched the opioid epidemic*, Bus. Insider (May 26, 2016), http://www.businessinsider.com/porter-and-jick-letter-launched-the-opioid-epidemic-2016-5 (hereinafter "Jacobs, *One-paragraph letter*"). As discussed in a 2009 article in the *American Journal of Public Health*, the 1980 Letter to the Editor "shed[] some light on the risk of addiction for acute pain, [but did] not help establish the risk of iatrogenic addiction when opioids are used daily for a prolonged time in treating chronic pain. [Indeed, t]here are a number of studies . . . that demonstrate that in the treatment of chronic non-cancer-related pain with opioids, there is a high incidence of prescription drug abuse." Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99(2) Am. J. Pub. Health 221-27 (Feb. 2009), https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC2622774/ (hereinafter "Van Zee, *Promotion and Marketing*").

[29]  *See* German Lopez, *A 5-sentence letter helped trigger America's deadliest drug overdose crisis ever*, Vox (June 1, 2017), https://www.vox.com/science-and-health/2017/ 6/1/15723034/ opioid-epidemic-

47.   Second was a single medical study published by Drs. Russell Portenoy ("Portenoy") and Kathleen Foley ("Foley") ("Portenoy Publication").[30] Portenoy emerged as one of the industry's most vocal proponents of long-term opioid use, who essentially made it his life's work to campaign for the movement to increase use of prescription opioids. He was one of Big Pharma's[31] "thought leaders" and was paid to travel the country to promote more liberal opioid prescribing for many types of pain. His talks were sponsored by the Manufacturing Defendants and organizations paid by them as continuing medical education ("CME") programs for doctors. He had financial relationships with at least a dozen pharmaceutical companies, most of which produced prescription opioids.[32]

48.   Portenoy has now admitted that he minimized the risks of opioids.[33] In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated that his

---

letter-1980-study).

[30]   In 1986, the medical journal *Pain*, which would eventually become the official journal of the American Pain Society ("APS"), published an article by Portenoy and Foley summarizing the results of a "study" of 38 chronic non-cancer pain patients who had been treated with opioid painkillers. Portenoy and Foley concluded that, for non-cancer pain, opioids "can be safely and effectively prescribed to selected patients with relatively little risk of producing the maladaptive behaviors which define opioid abuse." However, their study was neither scientific nor did it meet the rigorous standards commonly used to evaluate the validity and strength of such studies in the medical community. For instance, there was no placebo control group, and the results were retroactive (asking patients to describe prior experiences with opioid treatment rather than less biased, in-the-moment reports). The authors themselves advised caution, stating that the drugs should be used as an "alternative therapy" and recognizing that longer-term studies of patients on opioids would have to be performed. None was. *See* Russell K. Portenoy & Kathleen M. Foley, *Chronic use of opioid analgesics in non-malignant pain: report of 38 cases*, 25(2) Pain 171-86 (May 1986).

[31]   "Big Pharma" is used herein to refer to large pharmaceutical companies considered especially as a politically influential group.

[32]   Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop* 18 (Johns Hopkins University Press 2016) (citing Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (St. Martin's Press, 1st ed. 2003)).

[33]   *See* Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), http://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic (hereinafter "Gounder, *Who Is Responsible*").

- 18 -

earlier work purposefully relied on evidence that was not "real" and left real evidence behind:

> I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, ***none of which represented real evidence***, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before. ***In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.***[34]

49.     The damage, however, was already done. The Manufacturing Defendants used the two publications, the 1980 Letter to the Editor and the Portenoy Publication, as the foundation for a massive, far-reaching campaign to dramatically shift the thinking of healthcare providers, patients, policymakers and the public on the risk of addiction presented by opioid therapy. By 1997, the APS and the American Academy of Pain Medicine ("AAPM") (both funded by the Manufacturing Defendants) issued a "landmark consensus," co-authored by Portenoy, stating there is little risk of addiction or overdose in pain patients.[35]

50.     Following publication of the 1980 Letter to the Editor and the Portenoy Publication, the Manufacturing Defendants introduced powerful prescription opioids into the market. Purdue introduced MS Contin in 1987 and OxyContin in 1995, Janssen introduced Duragesic in 1990 and Cephalon's Actiq was first approved by the FDA in 1998. Endo's Opana and Opana ER were approved by the FDA in 2006, as was Janssen's Nucynta in 2008 and Nucynta ER in 2011, Cephalon's Fentora in 2006 and Insys' Subsys in 2012.

51.     These branded prescription opioids and their generic counterparts are highly addictive. Between doses, patients can suffer body aches, nausea, sweats, racing heart,

---

[34] Jacobs, *One-paragraph letter*, *supra* n.28; *See* Andrew Kolodny, *Opioids for Chronic Pain: Addiction is NOT Rare*, YouTube (Oct. 30, 2011), https://www.youtube.com/ watch?v=DgyuBWN9D4w& feature=youtube).

[35] Jacobs, *One-paragraph letter*, *supra* n.28.

hypertension, insomnia, anxiety, agitation, opioid cravings, opioid-induced hyperalgesia (heightened sensitivity to pain) and other symptoms of withdrawal. When the agony is relieved by the next dose, it creates a destructive cycle of dysphoria and euphoria that fosters addiction and dependence.

52.     Despite knowing of the highly addictive qualities of prescription opioids, the Manufacturing Defendants launched aggressive pro-opioid marketing efforts that effected a dramatic shift in the public's and prescribers' perception of the safety and efficacy of opioids for chronic long-term pain and everyday use.

53.     Contrary to what doctors had previously understood about opioid risks and benefits, for the last two decades they have been encouraged by the Manufacturing Defendants to prescribe opioids aggressively and have been assured, based on false evidence provided directly by the Manufacturing Defendants and numerous medical entities funded by the Manufacturing Defendants and others with financial interests in generating more opioid prescriptions, that: (i) the risk of becoming addicted to prescription opioids among patients being treated for pain was low, even as low as less than 1%; (ii) great harm was caused by "under-treated pain." These two foundational falsehoods led directly to the current opioid crisis.

54.     The strategy was an enormous marketing success. It was designed to redefine back pain, neck pain, headaches, arthritis, fibromyalgia and other common conditions suffered by most of the population at some point in their lives as a distinct malady – chronic pain – that doctors and patients should take seriously and for which opioids were an appropriate, successful and low-risk treatment. Indeed, studies now show more than 85% of patients taking OxyContin at common doses are doing so for chronic non-cancer pain.[36]

---

[36]  Ryan, *OxyContin goes global*, *supra* n.27.

55.     This false and misleading marketing strategy continued despite studies revealing that up to 56% of patients receiving long-term prescription opioid painkillers for chronic back pain progress to addictive opioid use, including patients with no prior history of addiction.[37]

56.     Thus, based on false and incomplete evidence, the Manufacturing Defendants expanded their market exponentially from patients with end-stage cancer and acute pain, an obviously limited customer base, to anyone suffering from chronic pain, which by some accounts includes approximately 100 million Americans – nearly one-third of the country's population.[38] The treatment of chronic pain includes patients whose general health is good enough to refill prescriptions month after month, year after year, and the promotion, distribution (without reporting suspicious sales) and rampant sale of opioids for such treatment has made defendants billions of dollars. It has also led to the opioid addiction and overdose crisis in the New York Metropolitan area.

### 2.     The Fraudulent Sales Practices

57.     As alleged below, the Manufacturing Defendants employed a variety of strategies to normalize the use of opioids for chronic long-term pain without informing the public and prescribers about the very significant risk of addiction, overdose and death.

### a.     The Manufacturing Defendants Funded Front Organizations that Published and Disseminated False and Misleading Marketing Materials

58.     Defendants sponsored purportedly neutral medical boards and foundations that educated doctors and set guidelines for the use of opioids in medical treatment in order to promote the liberal prescribing of opioids for chronic pain. The following organizations, funded

---

[37]   Lembke (2016), *supra* n.32, at 22 (citing Martell, *et al.*, *Systematic review: opioid treatment for chronic back pain: prevalence, efficacy and association with addiction*, 146(2) Ann. Intern. Med. 116-27 (2007)).

[38]   *AAPM Facts and Figures on Pain*, The American Academy of Pain Medicine, http://www.painmed.org/patientcenter/facts_on_pain.aspx (last visited Jan. 11, 2018).

by the Manufacturing Defendants, advised doctors that liberal prescribing of opioids was both safe and effective. In truth, it was neither.

59.     **Federation of State Medical Boards**: The Federation of State Medical Boards ("FSMB") is a national organization that functions as a trade group representing the 70 medical and osteopathic boards in the United States. The FSMB often develops guidelines that serve as the basis for model policies with the stated goal of improving medical practice. Defendants Purdue, Cephalon and Endo have provided substantial funding to the FSMB. In 2007, the FSMB printed and distributed a physician's guide on the use of opioids to treat chronic pain titled "Responsible Opioid Prescribing" by Dr. Scott M. Fishman ("Fishman"). After the guide (in the form of a book, still available for sale on Amazon) was adopted as a model policy, the FSMB reportedly asked Purdue for $100,000 to help pay for printing and distribution. Ultimately, the guide was disseminated by the FSMB to *700,000* practicing doctors.

60.     The guide's clear purpose is to focus prescribers on the purported under-treatment of pain and falsely assure them that opioid therapy is an appropriate treatment for chronic, non-cancer pain:

- Pain management is integral to good medical practice and for all patients;

- Opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins;

- Patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient.

\*      \*      \*

Four key factors contribute to the ongoing problem of under-treated pain:

1.     Lack of knowledge of medical standards, current research, and clinical guidelines for appropriate pain treatment;

    2.      The perception that prescribing adequate amounts of opioids will result in unnecessary scrutiny by regulatory authorities;

    3.      Misunderstanding of addiction and dependence; and

    4.      Lack of understanding of regulatory policies and processes.[39]

61.    While it acknowledges the risk of "abuse and diversion" (with little attention to addiction), the guide purports to offer "professional guidelines" that will "easily and efficiently" allow physicians to manage that risk and "minimize the potential for [such] abuse.[40] Indeed, it states that even for those patients assessed to have risk of substance abuse, "it does not mean that opioid use will become problematic or that opioids are contraindicated," just that physicians should use additional care in prescribing.

62.    The guide further warns physicians to "[b]e aware of the distinction between pseudoaddiction and addiction" and teaches that behaviors such as "[r]equesting [drugs] by name," "[d]emanding or manipulative behavior," "[o]btaining opioid drugs from more than one physician" and "[h]oarding opioids," which are, in fact, signs of genuine addiction, are all really just signs of "pseudoaddiction."[41] It defines "Physical Dependence" as an acceptable result of opioid therapy not to be equated with addiction and states that while "[i]t may be tempting to assume that patients with chronic pain and a history of recreational drug use who are not adherent to a treatment regimen are abusing medications," there could be other acceptable reasons for non-adherence.[42] The guide, sponsored by the Manufacturing Defendants and their pain foundations, became the seminal authority on opioid prescribing for the medical profession

---

[39]  Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* 8-9 (Waterford Life Sciences 2007).

[40]  *Id*. at 9

[41]  *Id*. at 62.

[42]  *Id*.

and dramatically overstated the safety and efficacy of opioids and understated the risk of opioid addiction.

63.     In 2012, Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care. As we work to reduce diversion and misuse of prescription opioids, *it's critical to remember that the problem of unrelieved pain remains as urgent as ever.*[43]

64.     The updated guide still assures that "*[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins.*"[44]

65.     In another guide by Fishman, he continued to downplay the risk of addiction: "*I believe clinicians must be very careful with the label 'addict.' I draw a distinction between a 'chemical coper' and an addict.*"[45] The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction."

66.     The heightened focus on the under-treatment of pain was a concept designed by Big Pharma to sell opioids. *The FSMB actually issued a report calling on medical boards to punish doctors for inadequately treating pain.*[46] Among the drafters of this policy was Dr. J. David Haddox ("Haddox"), who coined the term "pseudoaddiction," which wholly lacked

---

[43]   Scott M. Fishman, *Responsible Opioid Prescribing: A Guide for Michigan Clinicians*, 10-11 (Waterford Life Sciences 2012).

[44]   *Id.* at 11.

[45]   Scott M. Fishman, *Listening to Pain: A Physician's Guide to Improving Pain Management Through Better Communication* 45 (Oxford University Press 2012).

[46]   Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J., Dec. 17, 2012, at A1.

scientific evidence but quickly became a common way for the Manufacturing Defendants and their allies to promote the use of opioids even to patients displaying addiction symptoms. Haddox later became a Purdue Vice President.[47]

67.     As alleged more fully below, in 2012 and again in 2017, the guides and the sources of their funding became the subject of a Senate investigation.

68.     On June 8, 2012, the FSMB submitted a letter to the Senate Finance Committee concerning its investigation into the abuse and misuse of opioids.[48] While the letter acknowledged the escalation of drug abuse and related deaths resulting from prescription painkillers, the FSMB continued to focus on the "serious and related problem" that "[m]illions of Americans suffer from debilitating pain – a condition that, for some, can be relieved through the use of opioids." Among other things, the letter stated, "Studies have concluded that both acute pain and chronic pain are often under-treated in the United States, creating serious repercussions that include the loss of productivity and quality of life." The letter cited no such studies. The letter also confirmed that the FSMB's "Responsible Opioid Prescribing: A Physician's Guide" has been distributed in each of the 50 states and the District of Columbia.

69.     In addition, the FSMB letter disclosed payments the FSMB received from organizations that develop, manufacture, produce, market, or promote the use of opioid-based drugs from 1997 through the present. Included in the payments received are the following payments from defendants:

---

[47]   Celine Gounder, *Who Is Responsible for the Pain-Pill Epidemic?*, New Yorker (Nov. 8, 2013), http://www.newyorker.com/business/currency/who-is-responsible-for-the-pain-pill-epidemic (hereinafter "Gounder, *Who Is Responsible*")

[48]   June 8, 2012 Letter from Federation of State Medical Boards to U.S. Senators Max Baucus and Charles Grassley).

| Company | Fiscal Year | Amount |
|---|---|---|
| Purdue | 2001 | $38,324.56 |
| | 2002 | $10,000.00 |
| | 2003 | $85,180.50 |
| | 2004 | $87,895.00 |
| | 2005 | $244,000.00 |
| | 2006 | $207,000.00 |
| | 2007 | $50,000.00 |
| | 2008 | $100,000.00 |
| | *Total Purdue Payments* | *$822,400.06* |
| Endo | 2007 | $40,000.00 |
| | 2008 | $100,000.00 |
| | 2009 | $100,000.00 |
| | 2011 | $125,000.00 |
| | 2012 | $46,620.00 |
| | *Total Endo Payments* | *$371,620.00* |
| | | |
| Cephalon | 2007 | $30,000.00 |
| | 2008 | $100,000.00 |
| | 2011 | $50,000.00 |
| | *Total Cephalon Payments* | *$180,000.00* |
| Mallinckrodt | 2011 | $100,000.00 |
| | *Total Mallinckrodt Payments* | *$100,000.00* |

70.     The letter also disclosed payments of $40,000 by Endo and $50,000 by Purdue to directly fund the production of "Responsible Opioid Prescribing."

71.     **The Joint Commission**: The Joint Commission is an organization that establishes standards for treatment and accredits healthcare organizations in the United States. The Manufacturing Defendants, including Purdue, contributed misleading and groundless teaching materials and videos to the Joint Commission, which emphasized what Big Pharma coined the "under-treatment of pain," referenced pain as the "fifth vital sign" (the first and only

unmeasurable/subjective vital sign) that must be monitored and treated, and encouraged the use of prescription opioids for chronic pain while minimizing the danger of addiction. It also called doctors' concerns about addiction "inaccurate and exaggerated."

72.     In 2000, the Joint Commission printed a book for purchase by doctors as part of required continuing education seminars that cited studies claiming "***there is no evidence that addiction is a significant issue when persons are given opioids for pain control***." The book was sponsored by Purdue.

73.     In 2001, the Joint Commission and the National Pharmaceutical Council (founded in 1953 and supported by the nation's major research-based biopharmaceutical companies[49]) collaborated to issue a 101-page monograph titled "Pain: Current understanding of assessment, management, and treatments." The monograph states falsely that beliefs about opioids being addictive are "erroneous":

> Societal issues that contribute to the undertreatment of pain include drug abuse programs and erroneous beliefs about tolerance, physical dependence, and addiction (see I.E.5). For example, some clinicians incorrectly assume that exposure to an addictive drug usually results in addiction.
>
> *       *       *
>
> b.     Etiology, issues, and concerns
>
> Many medications produce tolerance and physical dependence, and some (*e.g.*, opioids, sedatives, stimulants, anxiolytics, some muscle relaxants) may cause addiction in vulnerable individuals. Most experts agree that ***patients who undergo prolonged opioid therapy usually develop physical dependence but do not develop addictive disorders. In general, patients in pain do not become addicted to opioids. Although the actual risk of addiction is unknown, it is thought to be quite low***. A recent study of opioid analgesic use revealed "low and stable" abuse of opioids between 1990 and 1996 despite significant increases in opioids prescribed. . . .
>
> Fear of causing addiction (i.e., iatrogenic addiction), particularly with opioid

---

[49]   Currently funded by Johnson & Johnson, Purdue and Teva, among others.

use, is a major barrier to appropriate pain management. This fear sometimes reflects a lack of understanding of the risk of addiction with therapeutic drug use. Although studies suggest that the risk of iatrogenic addiction is quite low (e.g., Perry and Heidrich, Zenz et al.), surveys indicate that clinicians often overestimate this risk.[50]

74.     Additionally, the monograph recommends that "[p]ain . . . is assessed in all patients" and suggests that long-acting (*i.e.*, extended release) pain medications are superior and urged their use whenever possible:

> Long-acting and sustained-release opioids are useful for patients with continuous pain, as they lessen the severity of end-of-dose pain and often allow the patient to sleep through the night.
>
> *     *     *
>
> • Administer opioids primarily via oral or transdermal routes, using long-acting medications when possible.[51]

In truth, such medications often do not last as long as promised, and there is evidence to suggest that the use of long-acting drugs may actually create more addicts.

75.     The Manufacturing Defendants' infiltration and influence over the Joint Commission's standards and literature exerted overwhelming pressure on doctors to treat and eliminate pain. As more and more doctors migrated from private practice to integrated healthcare systems in the 2000s, treatment options were dictated by, among other things, the Joint Commission's guidelines.[52] Consistent with the guidelines, doctors who left pain untreated were viewed as demonstrating poor clinical skills and/or being morally compromised.[53]

76.     The U.S. General Accounting Office's December 2003 Report to Congressional

---

[50]   *Pain: Current Understanding of Assessment, Management, and Treatments* 16-17 (Dec. 2001), http://www.npcnow.org/system/files/research/download/Pain-Current-Understanding-of-Assessment-Management-and-Treatments.pdf (footnotes and citations omitted)).

[51]   *Id*. at 38, 68 (Table 38).

[52]   Lembke (2016), *supra* n.32 at 119.

[53]   *Id*. at 42.

Requesters confirms that Purdue funded the "pain management educational courses" that taught the new standard of care for treating pain. It further revealed that Purdue disseminated educational materials on pain management, which "'facilitated [Purdue's] access to hospitals to promote OxyContin.'"[54]

77.    **American Pain Foundation**: The American Pain Foundation ("APF"), headquartered in Baltimore, Maryland, described itself as the nation's largest organization for pain patients.[55] While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from defendants Purdue, Endo, Janssen and Cephalon. It received more than $10 million in funding from opioid manufacturers from 2007 to 2012, when it shut down days after the U.S. Senate Committee on Finance ("Senate Finance Committee") launched an investigation of APF's promotion of prescription opioids.

78.    The APF's guides for patients, journalists and policymakers trivialized the risk of addiction and greatly exaggerated the benefits associated with opioid painkillers.[56]

79.    For example, in 2001, APF published "Treatment Options: A Guide for People Living with Pain."[57] The guide, which was produced due to support from companies including defendants Cephalon and Purdue, misrepresented the risks associated with opioid use. Among

---

[54]    Gounder, *Who Is Responsible*; *supra* n.47; U.S. General Accounting Office, GAO-04-110, Prescription Drugs, OxyContin Abuse and Diversion and *Efforts to Address the Problem* (Dec. 2003), http://www.gao.gov/new.items/d04110.pdf.

[55]    The APF was the focus of a December investigation by ProPublica in the *Washington Post* that detailed its close ties to drugmakers.

[56]    Charles Ornstein & Tracy Weber, *American Pain Foundation Shuts Down as Senators Launch Investigation of Prescription Narcotics*, ProPublica (May 8, 2012, 8:57 PM), http://www.opb.org/news/article/america_pain_foundation_shuts_down_as_senators_launch_investigation_of_prescription_narcotics/ (hereinafter "Ornstein, *American Pain Foundation*")).

[57]    *Treatment Options: A Guide for People Living with Pain*, American Pain Foundation, https://assets.documentcloud.org/documents/277605/apf-treatment options.pdf).

other things, the guide:

- lamented that opioids were sometimes called narcotics because *"[c]alling opioid analgesics 'narcotics' reinforces myths and misunderstandings* as it places emphasis on their potential abuse rather than on the importance of their use as pain medicines";[58]

- stated that "[o]pioids are an essential option for treating *moderate* to severe pain associated with surgery or trauma";[59] and

- opined that "[r]estricting access to the most effective medications for treating pain [opioids] is not the solution to drug abuse or addiction."[60]

The guide included blurbs from Portenoy, who is quoted as saying "[t]his is a very good resource for the pain patient," and Fishman, who is quoted as saying, "[w]hat a great job! Finally, a pill consumer resource created for patients with pain. A 'must have' for every physician's waiting room."[61]

80.     In 2003, APF published a newsletter titled "Best of . . . The Pain Community News" that purported to clarify any confusion over addiction and opioids and emphasized the "tragic consequence of leaving many people with severe pain under-treated because they – or their doctors – fear that opioids will cause addiction."

81.     In 2009, Endo sponsored APF's publication and distribution of "Exit Wounds: A Survival Guide to Pain Management for Returning Veterans & Their Families" ("Exit Wounds"), a book described as "the inspirational story of how one courageous veteran, with the aid of his family, recovered and thrived despite near death, traumatic brain injury, and the loss of a limb." It also purported to "offer veterans and their families comprehensive and authoritative information on . . . treatment options, and strategies for self-advocating for optimal pain care and

---

[58] *Id*. at 11.

[59] *Id*.

[60] *Id*. at 15.

[61] *Id*. at 76.

medical resources inside and outside the VA system."

82.    Among other false statements, Exit Wounds reported: "Long experience with opioids shows that *people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications*." Endo, through APF, thus distributed false information with the purpose of providing veterans false information they could use to "self-advocat[e]" for opioids while omitting a discussion of the risks associated with opioid use.

83.    In 2009, APF played a central role in a first-of-its-kind web-based series called "Let's Talk Pain," hosted by veteran TV journalist Carol Martin. The series brought together healthcare providers and "people with pain to discuss a host of issues from managing health care for pain to exploring integrative treatment approaches to addressing the psychological aspects associated with pain." The "Let's Talk Pain" talk show is still available online. In the very first episode of this talk show, the following exchange took place:

> [**Teresa Shaffer (APF Action Network Leader)**:] As a person who has been living with pain for over 20 years, opioids are a big part of my pain treatment. And I have been hearing such negative things about opioids and the risk factors of opioids. Could you talk with me a little bit about that?

> [**Dr. Al Anderson (AAPM Board of Directors)**:] The general belief system in the public is that the opioids are a bad thing to be giving a patient. Unfortunately, it's also prevalent in the medical profession, so patients have difficulty finding a doctor *when they are suffering from pain for a long period of time*, especially *moderate* to severe pain. And *that's the patients that we really need to use the opioids* methods of treatment, because they are the ones who need to have some help with the function and they're the ones that need to be controlled enough so that they can increase their quality of life.[62]

84.    In reality, there is little scientific evidence to support the contention that opioids taken long-term improve function or quality of life for chronic pain patients.[63] To the contrary,

---

[62] *Episode 1: Safe Use of Opioids (PainSAFE)*, Let's Talk Pain (Sept. 28, 2010), https:// www.youtube.com/ watch?v=zeAIvAMRgsk).

[63] Lembke (2016), *supra* n.32, at 59 (citing *Agency for Healthcare Research and Quality (US): The*

there is ample evidence that opioids impose significant risks and adverse outcomes on long-term users and that they may actually reduce function.[64] As a recent article in the *New England Journal of Medicine* concluded: "Although opioid analgesics rapidly relieve many types of acute pain and improve function, the benefits of opioids when prescribed for chronic pain are much more questionable." The article continues, "opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions."[65]

85.    The APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website called www.painknowledge.org.  NIPC promoted itself as an education initiative and promoted its expert leadership team, including purported experts in the pain management field. The website painknowledge.org promised that, on opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."

---

*Effectiveness and Risks of Long-Term Opioid Treatment of Chronic Pain*, Evid. Rep./Tech. Assess., No. 218 (2014), https://ahrq-ehc-application.s3.amazonaws.com/media/pdf/chronic-pain-opioid-treatment-research.pdf).

[64]   Discussing the CDC's "March 2016 Guideline for Prescribing Opioids for Chronic Pain," doctors wrote:

> Most placebo-controlled, randomized trials of opioids have lasted 6 weeks or less, and we are aware of no study that has compared opioid therapy with other treatments in terms of long-term (more than 1 year) outcomes related to pain, function, or quality of life. The few randomized trials to evaluate opioid efficacy for longer than 6 weeks had consistently poor results. In fact, several studies have showed that use of opioids for chronic pain may actually worsen pain and functioning, possibly by potentiating pain perception.

Thomas Frieden & Debra Houry, *Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1501-04 (Apr. 21, 2016), http://www.nejm.org/doi/full/10.1056/NEJMp1515917?af=R&rss=currentIssue&#t= article.

[65]   Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain – Misconceptions and Mitigation Strategies*, 374 New Eng. J. Med. 1253-63 (Mar. 31, 2016), http://www.nejm.org/doi/full/10.1056/NEJMra1507771#t=article.

Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. In a brochure available on painknowledge.org titled "Pain: Opioid Facts," the NIPC misled that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted" and even refused to rule out the use of opioid pain relievers for patients who have a history of addiction to opioids.[66]

86.     In or around 2011, the APF published the "Policymaker's Guide," sponsored by Purdue, which dispelled the notion that "strong pain medication leads to addiction" by characterizing it as a "*common misconception*":

> Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[67]

87.     The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . *Misconceptions about opioid addiction*."[68] It even characterizes as a "*myth*" that "*[c]hildren can easily become addicted to pain medications*."[69] The guide further asserts that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health and health-related quality of life

---

[66]   *Pain: Opioid Facts*, Pain Knowledge   https://web.archive.org/web/20101007102042/ http://painknowledge.org/patiented/pdf/Patient%20Education%20b380_b385%20%20pf%20opiod.pdf (last visited Jan. 11, 2018).

[67]   *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation at 5, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Jan. 11, 2018)

[68]   *Id*. at 6.

[69]   *Id*. at 40.

for chronic pain patients, which was not the case.[70]

88.     In December 2011, the *Washington Post* reported on ProPublica's investigation of

the APF, which detailed APF's close ties to drugmakers:

> [T]he pills continue to have an influential champion in the American Pain
> Foundation, which describes itself as the nation's largest advocacy group for pain
> patients. Its message: The risk of addiction is overblown, and the drugs are
> underused.
>
>    What the nonprofit organization doesn't highlight is the money behind that
> message.
>
>    The foundation collected nearly 90 percent of its $5 million in funding last year
> from the drug and medical-device industry – and closely mirrors its positions, an
> examination by ProPublica found.[71]

89.     **American Academy of Pain Medicine and American Pain Society**: The

*Manufacturing* Defendants, including at least Endo, Janssen and Purdue, have contributed

funding to the AAPM and the APS for decades.

90.     In 1997, the AAPM issued a "consensus" statement that endorsed opioids to treat

chronic pain and claimed that the risk that patients would become addicted to opioids was low.

The chairman of the committee that issued the statement, Haddox, was, at the time, a paid

speaker for Purdue. Haddox was later hired as Purdue's vice president for health policy. The

consensus statement, which also formed the foundation of the 1998 guidelines, was published on

---

[70]  The "Policymaker's Guide" cites for support "Opioids for chronic noncancer pain: a meta-analysis of
effectiveness and side effects," a review published in 2006 in the *Canadian Medical Association Journal*.
*Id.* at 34. However, the review concludes: "For functional outcomes, ***the other analgesics were
significantly more effective than were opioids***." Andrea D. Furlan, *et al.*, *Opioids for chronic noncancer
pain: a meta-analysis of effectiveness and side effects*, 174(11) Canadian Med. Assoc. J. 1589-94 (May
23, 2006), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC1459894/. The Purdue-sponsored guide failed
to disclose both this conclusion and the fact that the review analyzed studies that lasted, on average, five
weeks and therefore could not support the long-term use of opioids.

[71]  Charles Ornstein & Tracy Weber, *Patient advocacy group funded by success of painkiller drugs, probe
finds*, Wash. Post (Dec. 23, 2011), https://www.washingtonpost.com/ national/health-science/patient-
advocacy-group-funded-by-success-of-painkiller-drugs-probe-finds/2011/12/20/gIQAgvczDP_story.html
?utm_term=. 22049984c606.

the AAPM's website. AAPM's corporate council includes Purdue, Depomed, Teva and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Fishman (2005), Dr. Perry G. Fine ("Fine") (2011) and Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well-documented as set forth below.

91.     At or about the same time, the APS introduced the "pain as the 5th vital sign" campaign, followed soon thereafter by the U.S. Department of Veterans Affairs adopting that campaign as part of their national pain management strategy.

92.     AAPM and APS issued guidelines in 2009 ("2009 Guidelines") that continued to recommend the use of opioids to treat chronic pain. Fourteen of the twenty-one panel members who drafted the 2009 Guidelines received funding from defendants Janssen, Cephalon, Endo or Purdue.

93.     The 2009 Guidelines falsely promoted opioids as safe and effective for treating chronic pain and concluded that the risk of addiction was manageable for patients regardless of past abuse histories.[72] The 2009 Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians but also the body of scientific evidence on opioids; they were reprinted in the journal *Pain*, have been cited hundreds of times in academic literature and remain available online. The Manufacturing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions.

> **b.      The Manufacturing Defendants Paid Key
> Opinion Leaders and Sponsored Speakers' Bureaus
> to Disseminate False and Misleading Messaging**

---

[72]  Roger Chou, *et al.*, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10(2) J. Pain 113 (Feb. 2009), http://www.jpain.org/article/S1526-5900(08)00831-6/pdf (hereinafter "Chou, *Clinical Guidelines*").

94.     The Manufacturing Defendants have paid millions of dollars to physicians to promote aggressive prescribing of opioids for chronic pain. Recently released federal data shows that the Manufacturing Defendants increased such payments to physicians who treat chronic pain even while the opioid crisis accelerated and overdose deaths from prescription opioids and related illicit drugs, such as heroin, soared to record rates.[73] These payments come in the form of consulting and speaking fees, free food and beverages, discount coupons for drugs and other freebies. The total payments from the Manufacturing Defendants to doctors related to opioids doubled from 2014 to 2015. Moreover, according to experts, research shows even small amounts of money can have large effects on doctors' prescribing practices.[74] Physicians who are high prescribers are more likely to be invited to participate in defendants' speakers' bureaus. According to a study published by the U.S. National Institutes of Health, "[i]n the speakers' bureau system, physicians are recruited and trained by pharmaceutical, biotechnology, and medical device companies to deliver information about products to other physicians, in exchange for a fee."[75]

95.     The use of speakers' bureaus has led to substantial ethical concerns within the medical field. According to a 2013 publication by the Institute on Medicine as a Profession, speakers' bureaus are ethically compromised because they often present information as objective when it is heavily biased toward the interests of the industry sponsor and, in fact, may lead to the dissemination of false or biased information.

---

[73]   Joe Lawlor, *Even amid crisis, opioid makers plied doctors with perks*, Portland Press Herald (Dec. 25, 2016),       http://www.pressherald.com/2016/12/25/even-amid-crisis-opioid-makers-plied-doctors-with-perks/.

[74]   *Id.*

[75]   Lynette Reid & Matthew Herder, *The Speakers' bureau system: a form of peer selling*, 7(2) Open Med. e31-e39 (Apr. 2, 2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3863750/.

96.     These findings are substantiated by research in the *Journal of the American Medical Association*, *The Journal of Law, Medicine & Ethics* and *Academic Psychiatry*.

The Problem:

Pharmaceutical companies often recruit physicians to perform speeches or presentations for the purpose of marketing a specific drug. In 2010, 8.6% of physicians reported having received payments for participating in speakers' bureaus. These speakers' bureaus leverage the credibility of physicians in order to promote the use of pharmaceutical products. The physicians are generally trained to present a certain message, or are provided with pre-produced slides. The audience may assume that these presentations are objective, when in fact they are heavily biased towards the interests of the industry sponsor.

**Speakers' bureaus may lead to the dissemination of false or biased information.** Exposure to industry-sponsored speaking events is associated with decreased quality of prescribing. Additionally, the compensation provided for these engagements may influence the attitudes or judgment of the presenter.[76]

97.     For example, Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member and as president of the AAPM, and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed above, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Manufacturing Defendants. He has also worked to oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients. He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."[77]

---

[76]    *Speakers' Bureaus: Best Practices for Academic Medical Centers*, IMAP (Oct. 10, 2013), http://imapny.org/wp-content/themes/imapny/File%20Library/Best%20Practice%20toolkits/    Best-Practices_Speakers—bureaus.pdf.

[77]    Scott M. Fishman, *Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion*, 306(13) JAMA 1445 (2011); Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry,* ProPublica (Dec. 23, 2011, 2:14 PM), https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry (hereinafter "Weber, *Two Leaders in Pain*").

98.     Similarly, Fine's ties to the Manufacturing Defendants have been well documented.[78] He has authored articles and testified in court cases and before state and federal committees, and he, too, has served as president of the AAPM and argued against legislation restricting high-dose opioid prescription for non-cancer patients. Multiple videos feature Fine delivering educational talks about prescription opioids. He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.[79] He has also acknowledged having failed to disclose numerous conflicts of interest.

99.     Fishman and Fine are only two of the many physicians whom the Manufacturing Defendants paid to present false or biased information on the use of opioids for chronic pain.

### c.     Senate Investigations of the Manufacturing Defendants

100.     In May 2012, Senators Max Baucus (D-MT) and Chuck E. Grassley (R-IA), the Chair and the Ranking Member of the Senate Finance Committee, respectively, launched an investigation into makers of narcotic painkillers and groups that champion them. The investigation was triggered by "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers," including popular brand names like OxyContin, Vicodin and Opana.

101.     The Senate Finance Committee sent letters to Purdue, Endo and Johnson & Johnson, as well as five groups that support pain patients, physicians or research, including the APF, AAPM, APS, University of Wisconsin Pain & Policy Studies Group and the Center for Practical Bioethics. Letters also went to the FSMB and the Joint Commission.

102.     As shown from the following excerpt from the Senators' letter to APF, the

---

[78]   Weber, *Two Leaders in Pain*, *supra* n.77.

[79]   Linda Deutsch, *Doctor: 1,500 pills don't prove Smith was addicted,* Seattle Times (Sept. 22, 2010, 5:16 PM), http://www.seattletimes.com/entertainment/doctor-1500-pills-dont-prove-smith-was-addicted/.

Senators addressed the magnitude of the epidemic and asserted that mounting evidence supports

that the pharmaceutical companies may be responsible:

> It is clear that the United States is suffering from an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers such as Oxycontin (oxycodone), Vicodin (hydrocodone), Opana (oxymorphone). According to CDC data, "more than 40% (14,800)" of the "36,500 drug poisoning deaths in 2008" were related to opioid-based prescription painkillers. Deaths from these drugs rose more rapidly, "from about 4,000 to 14,800" between 1999 and 2008, than any other class of drugs, [killing] more people than heroin and cocaine combined. More people in the United States now die from drugs than car accidents as a result of this new epidemic. Additionally, the CDC reports that improper "use of prescription painkillers costs health insurers up to $72.5 billion annually in direct health care costs."

> \*       \*       \*

> Concurrent with the growing epidemic, the New York Times reports that, based on federal data, "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks" while "[d]ata suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses."

> There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness. Recent investigative reporting from the Milwaukee Journal Sentinel/MedPage Today and ProPublica revealed extensive ties between companies that manufacture and market opioids and non-profit organizations such as the American Pain Foundation, the American Academy of Pain Medicine, the Federation of State Medical Boards, and University of Wisconsin Pain and Policy Study Group, and the Joint Commission.

> In a ProPublica story published in the Washington Post, the watchdog organization examined the American Pain Foundation, a "health advocacy" organization that received "nearly 90 percent of its $5 million funding from the drug and medical device industry." ProPublica wrote that its review of the American Pain Foundation's "guides for patients, journalists, and policymakers play down the risks associated with opioids and exaggerate their benefits. Some of the foundation's materials on the drugs include statements that are misleading or based on scant or disputed research."

> According to the Milwaukee Journal Sentinel/MedPage Today, a "network of national organizations and researchers with financial connections to the makers of narcotic painkillers . . . helped create a body of dubious information" favoring opioids "that can be found in prescribing guidelines, patient literature, position

statements, books and doctor education courses."[80]

Although it is critical that patients continue to have access to opioids to treat serious pain, pharmaceutical companies and health care organizations must distribute accurate and unbiased information about these drugs in order to prevent improper use and diversion to drug abusers.[81]

103.    The Senators demanded substantial discovery, including payment information from the companies to various groups, including the front organizations identified above, and to physicians, including Portenoy, Fishman and Fine, among others. They asked about any influence the companies had on a 2004 pain guide for physicians that was distributed by the FSMB, on the APS' guidelines and on the APF's Military/Veterans Pain Initiative. Almost immediately upon the launch of the Senate investigation, the APF shut down "due to irreparable economic circumstances." The opioid report resulting from this investigation has not been released publicly.[82]

104.    On March 29, 2017, it was widely reported[83] that yet another Senate investigation had been launched:

Missouri Senator Claire McCaskill has launched an investigation into some of the country's leading prescription drug manufacturers, demanding documents and records dating back the past five years which indicate just what the companies

---

[80]   For example, the *Sentinel* reported that the Federation of State Medical Boards, with financial support from opioid manufacturers, distributed "[m]ore than 160,000 copies" of a model policy book that drew criticism from doctors because "it failed to point out the lack of science supporting the use of opioids for chronic, non cancer pain." John Fauber, *Follow the Money: Pain, Policy, and Profit*, MedPage Today (Feb. 19, 2012), http://www.medpagetoday.com/Neurology/PainManagement/ 31256.

[81]   May 8, 2012 Letter from U.S. Senators Charles E. Grassley and Max Baucus to Catherine Underwood, Executive Director, American Pain Society, https://www.finance.senate.gov/imo/media/doc/ 05092012%20Baucus%20Grassley%20Opioid%20Investigation%20Letter%20to%20American%20Pain %20Society.pdf (footnote added).

[82]   Paul D. Thacker, *Senators Hatch and Wyden: Do your jobs and release the sealed opioids report*, Stat News (June 27, 2016), https://www.statnews.com/ 2016/06/27/opioid-addiction-orrin-hatch-ron-wyden/; *see also* Ornstein, *American Pain Foundation*, *supra* n.56.

[83]   Nadia Kounang, *Senator opens investigation into opioid manufacturers*, CNN (Mar. 29, 2017, 11:06 AM), http://www.cnn.com/2017/03/28/health/senate-opioid-manufacturer-investigation/ index.html.

knew of the drugs' risk for abuse as well as documents detailing marketing practices and sales presentations. Her office has sent letters to the heads of Purdue, Janssen/Johnson & Johnson, Insys, Mylan, and Depomed.

The above-referenced companies were reportedly targeted based on their role in manufacturing some of the opioid painkillers with the highest sales in 2015.

105.    On September 6, 2017, Senator McCaskill's report, "Fueling an Epidemic: Insys Therapeutics and the Systemic Manipulation of Prior Authorization" was published. The report finds that Insys manipulated the prior authorization process by misleading pharmacy benefit managers about the role of Insys in the prior authorization process and the presence of breakthrough cancer pain in potential Subsys patients.[84]

106.    On September 12, 2017, Senator McCaskill convened a Roundtable Discussion on Opioid Marketing. During the hearing, Senator McCaskill stated:

> The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious addiction. As it turns out, these messages were exaggerations at best and outright lies at worst.
>
> *       *       *
>
>    Our national opioid epidemic is complex, but one explanation for this crisis is simple, pure greed.

107.    Professor Adriane Fugh-Berman ("Fugh-Berman"), Associate Professor at Georgetown University Medical Center and director of a program at Georgetown called Pharmed Out, which conducts research on and educates the public about inappropriate pharmaceutical company marketing, also testified during the hearing. She, too, placed the blame for the opioid crisis squarely at the feet of pharmaceutical companies:

---

[84]    HSGAC Minority Staff Report, Insys Therapeutics and the Systemic Manipulation of Prior Authorization (2017).

Since the 1990's, pharmaceutical companies have stealthily distorted the perceptions of consumers and healthcare providers about pain and opioids. Opioid manufacturers use drug reps, physicians, consumer groups, medical groups, accreditation and licensing bodies, legislators, medical boards and the federal government to advance marketing goals to sell more opioids. This aggressive marketing pushes resulted in hundreds of thousands of deaths from the overprescribing of opioids. The U.S. is about – comprises about five percent of the world population, but we use about two-thirds of the world supply of opioids.

108.   Fugh-Berman also answered why doctors were able to be convinced by pharmaceutical companies' marketing efforts:

Why the physicians fall for this? Well, physicians are overworked, overwhelmed, buried in paperwork and they feel unappreciated. Drug reps are cheerful. They're charming. They provide both appreciation and information. Unfortunately, the information they provide is innately unreliable.

Pharmaceutical companies influence healthcare providers' attitudes and their therapeutic choices through financial incentives that include research grants, educational grants, consulting fees, speaking fees, gifts and meals.

109.   Fugh-Berman further described the false information provided by pharmaceutical companies and the industry creation of front organizations, including the APF, to pass industry-influenced regulations and policies:

Pharmaceutical companies convinced healthcare providers that they were opiophobic and that they were causing suffering to their patients by denying opioids to patients with back pain or arthritis. They persuaded prescribers that patients with pain were somehow immune to addiction. Even when addiction was suspected, physicians were taught that it might not really be addiction, it might be pseudo-addiction, an invented (ph) condition that's treated by increasing opioid dosages.

Industry created the American Pain Foundation co-opted other groups including medical organizations, and they change state laws to eliminate curbs on opioid prescribing. Between 2006 and 2015, pharmaceutical companies and the advocacy groups they control employ 1,350 lobbyists a year in legislative hubs. Industry-influenced regulations and policies ensure that hospitalized patients were and are berated paraded constantly about their level of pain and overmedicated with opioids for that pain. Even a week of opioids can lead a patient into addiction so many patients are discharged from hospitals already dependent on opioids.

110.   In addition, Fugh-Berman pointed out that promotion of opioids remains ongoing

despite increasing public concern about their use:

> Promotion of opioids is not in the past. Between 2013 and 2015, one in 12 physicians took out money from opioid manufacturers, a total of more than $46 million. Industry-friendly messages that pharmaceutical companies are currently perpetuating reassure physicians that prescribing opioids is safe as long as patients do not have a history of substance abuse or mental illness.

111.    Fugh-Berman concluded by stating: "It is a misperception to think that most opioid deaths are caused by misuse of opioids or overdoses. In fact, many deaths occur when people are using opioids in exactly the way they were prescribed. Misuse isn't the problem; use is the problem."

### 3.    The Devastating Impact

112.    The impact of the Manufacturing Defendants' false messaging has been profound. The drug companies profited handsomely as more and more people became addicted to opioids and died of overdoses.[85]

113.    For Purdue, sales grew from $48 million per year in 1996, to over $1 billion per year in 2000, to $3.1 billion per year ten years later. In 2011, pharmaceutical companies generated revenues of $11 billion from opioid sales alone.

114.    The United States, including specifically the New York metropolitan area, is experiencing an unprecedented opioid addiction and overdose epidemic, costing millions in health insurance.

115.    By 2002, "[l]ifetime **nonmedical** use of OxyContin increased from 1.9 million to 3.1 million people between 2002 and 2004, and in 2004 there were 615,000 new nonmedical users of OxyContin."[86]

---

[85]  German Lopez, *How big pharma got people hooked on dangerous opioids – and made tons of money off it*, Vox (Sept. 22, 2016, 3:00 PM), http://www.vox.com/2016/2/5/10919360/opioid-epidemic-chart.

[86]  Van Zee, *Promotion and Marketing* 99(2) Am. J. Pub. Health 221-27 (Feb. 2009),.

116.   By 2004, OxyContin had "become the most prevalent prescription opioid abused in the United States."[87] The severity of the problem was first felt in states including Maine, West Virginia, eastern Kentucky, southwestern Virginia and Alabama, where, from 1998 through 2000, hydrocodone and oxycodone were being prescribed 2.5-5 times more often than the national average. By 2000, these same areas had a prescription rate up to 5-6 times higher than the national average. These areas were also the first to suffer increased abuse and diversion, which became apparent by 1999 and 2000. Manufacturers then expanded the geographic market by investing hundreds of millions of dollars in marketing, and the once-regional problem began to spread nationally. "[B]y 2004 OxyContin had become a leading drug of abuse in the United States."[88]

117.   As OxyContin sales grew between 1999 and 2002, so did sales of other opioids, including fentanyl (226%), morphine (73%) and oxycodone (402%). And, as prescriptions surged between 1999 and 2010, so did deaths from opioid overdoses (from about 4,000 to almost 17,000).[89]

118.   In 2012 alone, an estimated 259 million opioid prescriptions were filled, enough to medicate every adult in the United States for a month on a round-the-clock basis.[90] In 2014, there were more than 47,000 drug overdose deaths nationwide, 61% involving a prescription or illicit opioid.[91] The use of prescription painkillers cost health insurers up to $72.5 billion

---

[87]   *Id.*

[88]   *Id.*

[89]   Gounder, *Who Is Responsible*, *supra* n.47.

[90]   *Opioid Painkiller Prescribing*, Centers for Disease Control and Prevention: Vital Signs (July 2014), https://www.cdc.gov/vitalsigns/opioid-prescribing/.

[91]   Rose A. Rudd, et al., *Increases in Drug and Opioid-Involved Overdose Deaths – United States, 2010-2015*, 65 Morbidity & Mortality Weekly Report 1445-52 (2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm (hereinafter "Rudd, *Increases in Drug and Opioid-Involved Overdose*").

annually in direct healthcare costs.[92]

119.    "Overdose deaths in New York related to heroin use reached a record high of 825 in 2014, a jump of more than 23 percent from the previous year and nearly 25 times the number of decade earlier. Deaths in which prescription opioids were a contributing factor also reached a new peak in 2014, nearly, nearly four times the level in 2005. Comparing the death rates in 2005 and 2014 for both substances, New York's increased more than almost any other state for which such data were available.[93] The number of overdose deaths in New York in which prescription opioids were a contributing cause also reached a new peak of 1,008 in 2014 which is nearly quadruple the number of prescription opioid overdose fatalities recorded in 2005.[94]

120.    Plaintiffs have suffered significant financial consequences as a result of opioid over-prescription and addiction, including, but not limited to, having purchased (directly or indirectly), paid for, and reimbursed for opioids intended for consumption by its members, retirees, and their families; increased payments for medicines to treat HIV and/or hepatitis C related to opioid misuse, addiction, and/or overdose; and increased payments for opioid overdose reversal medication.

B.    **The Manufacturing Defendants' Specific Unlawful Practices that Targeted the Funds**

1.    **Purdue**

121.    Purdue, which is privately owned by the Sackler family, manufactures, markets, sells and distributes the following prescription opioids:

---

[92]   Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune Magazine (Nov. 9, 2011), http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/ (hereinafter "Eban, *Painful Medicine*").

[93] DiNapoli, *Opioid Abuse in New York*, *supra* n.20.

[94] *Id.*

| OxyContin (oxycodone hydrochloride extended release) | Opioid agonist[95] indicated for pain severe enough to require daily, around-the-clock, longterm opioid treatment; not indicated as an as-needed (p.r.n.) analgesic. It was first approved by the FDA in December 1995. | Schedule II |
|---|---|---|
| MS Contin (morphine sulfate extended release) | Opioid agonist; controlled-release tablet form of morphine sulfate indicated for the management of severe pain; not intended for use as a p.r.n. analgesic; first approved in May 1987 as the first formulation of an opioid pain medicine that allowed dosing every 12 hours. | Schedule II |
| Dilaudid (hydromorphone hydrochloride) | Opioid analgesic; injectable and oral formulation; eight times more potent than morphine.[96] | Schedule II |
| Dilaudid-HP (hydromorphone hydrochloride) | Opioid analgesic; injectable and oral high- potency and highly concentrated formulation indicated for relief of moderate-to-severe pain in opioid-tolerant patients. | Schedule II |
| Hysingla ER (hydrocodone bitrate) | Brand-name extended-release form of hydrocodone bitrate that is indicated for the management of severe pain. | Schedule II |
| Targiniq ER (oxycodone hydrochloride and naloxone hydrochloride) | Brand-name extended-release opioid analgesic made of a combination of oxycodone hydrochloride and naloxone hydrochloride. It was approved by the FDA on July 23, 2013. | Schedule II |

### a. Purdue Falsely Marketed Extended-Release Drugs as Safer and More Effective than Regular-Release Drugs

122.    Purdue launched OxyContin 20 years ago with a bold marketing claim: "One dose

---

[95] An "agonist" medication is one that binds to and fully activates targeted receptors in the brain. They activate these neurotransmitter receptors to illicit a certain response. An "antagonist" medication, on the other hand, works to prevent the binding of other chemicals to neurotransmitters in order to block a certain response. Both may be used to offer pain relief. *Health Q&A*, Reference*, https://www.reference.com/health/difference-between-agonist-antagonist-drugs-838e9e0994a788eb (last visited Jan. 11, 2018).

[96] *Dilaudid Addiction*, Suboxone California, http://www.suboxonecalifornia.com/suboxone-treatment/dilaudid-addiction (last visited Jan. 11, 2018).

relieves pain for 12 hours, more than twice as long as generic medications."[97] Purdue told

doctors in its OxyContin press release that one tablet would provide "smooth and sustained pain

control all day and all night." Based in large part on that promise, and repeated assurances that

opioids were both effective and non-addictive, OxyContin became America's bestselling

painkiller.[98]

123.    Purdue's nationwide marketing claims were highly deceptive. OxyContin was not

superior to immediate-release opioids. And not only does OxyContin wear off early, as Purdue's

own early studies showed, it is highly addictive:

> OxyContin's stunning success masked a fundamental problem: The drug wears off
> hours early in many people, a Los Angeles Times investigation found. ***OxyContin
> is a chemical cousin of heroin, and when it doesn't last, patients can experience
> excruciating symptoms of withdrawal, including an intense craving for the
> drug[99].***

124.    Furthermore, experts call the 12-hour dosing "an addiction producing

machine."[100] Purdue had reportedly known for decades that it falsely promised 12-hour relief and

nevertheless mobilized hundreds of sales representatives to "refocus" physicians on 12-hour

---

[97]   Harriet Ryan, *et al.*, *"You Want A Description of Hell?" OxyContin's 12-Hour Problem*, L.A. Times
(May 5, 2016), http://www.latimes.com/projects/oxycontin-part1/ (hereinafter "Ryan, *Description of
Hell*").

[98]   Press Release, Purdue Pharma L.P., *New Hope for Millions of Americans Suffering from Persistent
Pain: Long-Acting OxyContin Tablets Now Available to Relieve Pain* (May 31, 1996),
https://www.freelibrary.com/NEW+HOPE+FOR+MILLIONS+OF+AMERICANS+SUFFERING+FRO
M+PERSISTENT+PAIN%3A...-a018343260.

[99]   The *Los Angeles Times* investigation, reported in three parts on May 5, July 10 and December 18,
2016, included the review of thousands of pages of confidential Purdue documents and court and other
records. They span three decades, from the conception of OxyContin in the mid-1980s to 2011, and
include e-mails, memoranda, meeting minutes and sales reports, as well as sworn testimony by
executives, sales representatives and other employees. Ryan, *Description of Hell*, *supra* n.97. The *Los
Angeles Times* reporters also examined FDA records, Patent Office files and medical journal articles, and
interviewed experts in pain treatment, addiction medicine and pharmacology. *Id*.

[100]   Kathleen Frydl, *Purdue Pharma: Corporate Fraud With a Body Count*, Alternet (May 18, 2016),
https://www.alternet.org/ drugs/purdue-pharma-corporate-fraud-body-count (hereinafter "Frydl, *Purdue
Pharma*").

dosing:

- . . . Even before OxyContin went on the market, ***clinical trials showed many patients weren't getting 12 hours of relief***. Since the drug's debut in 1996, the company has been confronted with additional evidence, including complaints from doctors, reports from its own sales reps and independent research.

- The company has held fast to the claim of 12-hour relief, in part to protect its revenue. OxyContin's market dominance and its high price – up to hundreds of dollars per bottle – hinge on its 12-hour duration. Without that, it offers little advantage over less expensive painkillers.

- When many doctors began prescribing OxyContin at shorter intervals in the late 1990s, Purdue executives mobilized hundreds of sales reps to "refocus" physicians on 12-hour dosing. Anything shorter "needs to be nipped in the bud. NOW!!" one manager wrote to her staff.

- Purdue tells doctors to prescribe stronger doses, not more frequent ones, when patients complain that OxyContin doesn't last 12 hours. That approach creates risks of its own. Research shows that the more potent the dose of an opioid such as OxyContin, the greater the possibility of overdose and death.

- More than half of long-term OxyContin users are on doses that public health officials consider dangerously high, according to an analysis of nationwide prescription data conducted for The Times.[101]

125. As reported by *The New York Times*, "internal Purdue Pharma documents show that company officials recognized even before the drug was marketed that they would face stiff resistance from doctors who were concerned about the potential of a high-powered narcotic like OxyContin to be abused by patients or cause addiction." To combat this resistance, Purdue promised the long-acting, extended-release formulation as safer and "less prone to such problems."[102]

126. Purdue's sales culture required aggressive sales of its opioids and embraced the

---

[101]   Ryan, *Description of Hell*, *supra* n.97.

[102]   Barry Meier, *In Guilty Plea, OxyContin Maker to Pay $600 Million*, N.Y. Times (May 10, 2007), http://www.nytimes.com/2007/05/10/business/11drug-web.html (hereinafter "Meier, *Guilty Plea*").

sell-at-any-cost notion: "sell or be gone." Aggressive quotas were put into place for opioids including OxyContin, at all dosage levels, as well as Hysingla products. The highest dosage for OxyContin was referred to by Purdue sales representatives as "hillbilly heroin." When sales representatives failed to meet their quotas, they were placed on performance employment plans and/or terminated. When they were successful, they were richly rewarded with extravagant bonuses and prizes. Notably, the astronomical sales of that group at the time were driven in part by one or more pill mills in the area, which eventually had to be shut down. There was so much money to be made, and so much pressure to meet quotas, that sales representatives became desensitized to what they were selling.

### b. Purdue Falsely Marketed Low Addiction Risk to Wide Swaths of Physicians

127.    In addition to pushing OxyContin as safe and non-addictive by equating extended-release with a lower risk, Purdue also promoted the use of prescription opioids for use in non-cancer patients, who make up 86% of the total opioid market today.[103]

128.    Rather than targeting merely those physicians treating acute severe short-term (like post-operative) pain or oncologists treating end-stage cancer pain, reports indicate that Purdue heavily promoted OxyContin nationwide to doctors such as general practitioners, who often had little training in the treatment of serious pain or in recognizing signs of drug abuse in patients.[104]

129.    Sales representatives plied these and other physicians with coupons that were redeemable for a 7- to 30-day supply of free OxyContin, a Schedule II narcotic that by definition cannot be prescribed for more than one month at a time, with the promise that OxyContin was a

---

[103]   Ornstein, *American Pain Foundation*, *supra* n.56.

[104]   Meier, *Guilty Plea*, *supra* n.102.

safe opioid. Purdue "trained its sales representatives to carry the message that the risk of addiction was 'less than one percent,'" and a "consistent feature in the promotion and marketing of OxyContin was a systematic effort to minimize the risk of addiction in the use of opioids for the treatment of chronic non-cancer-related pain."[105] As recently as 2015 if not later, Purdue sales representatives were telling physicians OxyContin was "addiction resistant" and had "abuse-deterrent technology."

130. Purdue tracked physicians' prescribing practices by reviewing pharmacy prescription data it obtained from IMS Health, a company that buys bulk prescription data from pharmacies and resells it to drug makers for marketing purposes. Rather than reporting highly suspicious prescribing practices, Purdue used the data to track physicians who prescribed some opioids and might be persuaded to prescribe more. Purdue also could identify physicians writing large numbers of prescriptions, and particularly for high-dose 80 mg pills – potential signs of diversion and drug dealing.[106]

131. Purdue knew about many suspicious doctors and pharmacies from prescribing records, pharmacy orders, field reports from sales representatives and, in some instances, its own surveillance operations.[107] Since 2002, Purdue maintained a confidential roster of suspected

---

[105]  Van Zee, *Promotion and Marketing*, *supra* n.28.

[106]  An 80 mg tablet is equivalent in strength to 16 Vicodin tablets, and was generally reserved by doctors for patients with severe, chronic pain who had built up a tolerance over months or years. In the illegal drug trade, however, "80s" were the most in demand. For those attempting to detect how OxyContin was getting onto the black market, a physician writing a high volume of 80s was a red flag. Harriet Ryan, *et al.*, *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, L.A. Times (July 10, 2016), http://www.latimes.com/ projects/la-me-oxycontin-part2/ (hereinafter "Ryan, *More than 1 million*").

[107]  Purdue's "Abuse and Diversion Detection" program requires its sales representatives to report to the company any facts that suggest a healthcare provider to whom it markets opioids may be involved in the abuse or illegal diversion of opioid products. When a provider is reported under the program, Purdue purportedly conducts an internal inquiry regarding the provider to determine whether he or she should be placed on a "no-call" list. If a provider is placed on this list, Purdue sales representatives may no longer

reckless prescribers known as "Region Zero." By 2013, there were more than 1,800 doctors in Region Zero, but Purdue had reported only 8% of them to authorities. The *Los Angeles Times* reported that "[a] former Purdue executive, who monitored pharmacies for criminal activity, acknowledged that even when the company had evidence pharmacies were colluding with drug dealers, it did not stop supplying distributors selling to those stores."[108]

**c.    Purdue Funded Publications and
Presentations with False and Misleading Messaging**

132.    As explained above, Purdue's false marketing scheme did not end with its own sales representatives and branded marketing materials. It extended far beyond, engaging third parties including doctors and front groups to spread the false message of prescription opioids' safety and efficacy.

133.    Purdue caused the publication and distribution of false and deceptive guidelines on opioid prescribing. For example, as set forth above, Purdue paid $100,000 to the FSMB to help print and distribute its guidelines on the use of opioids to treat chronic pain to ***700,000*** practicing doctors.

134.    One of the advisors for Fishman's 2007 publication "Responsible Opioid Prescribing: A Physician's Guide" and its 2012 update was Haddox, a longtime member of Purdue's speakers' bureau who later became a Purdue vice president.

135.    Similarly,[109] multiple videos feature Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for

---

contact the provider to promote the company's opioid products. Bill Fallon, *Purdue Pharma agrees to restrict marketing of opioids*, Stamford Advocate (Aug. 25, 2015, 3:32 PM), http://www.stamfordadvocate.com/business/article/Purdue-Pharma-agrees-to-restrict-marketing-of-6464800.php (hereinafter "Fallon, *Purdue Pharma agrees*").

[108]    Ryan, *More than 1 Million*, *supra* n.106.

[109]    Weber, *Two Leaders in Pain*, *supra* n.77.

Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain.[110] He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture."[111]

136.    Purdue provided many "teaching" materials free of charge to the Joint Commission.

137.    Purdue also deceptively marketed the use of opioids for chronic pain through the APF, which was shut down after the launching of the Senate investigation in 2012. In 2010 alone, the APF received 90% of its funding from drug and medical device companies, including from Purdue. Purdue paid APF unspecified amounts in 2008 and 2009 and between $100,000 and $499,999 in 2010.[112]

### d.    The Guilty Pleas

138.    In May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors

---

[110]    Perry A. Fine, *Safe and Effective Opioid Rotation*, YouTube (Nov. 8, 2012), https:// www.youtube.com/ watch?v=_G3II9yqgXI).

[111]   *Id.*

[112]  American Pain Foundation Partner Report, GuideStar, http://www.guidestar.org/PartnerReport .aspx?ein=52-2002328&Partner=Demo (last visited Jan. 11, 2018) (links to annual reports at bottom of page).

about the risk of addiction. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction and was unsupported by science. Additionally, Michael Friedman ("Friedman"), the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell ("Udell"), Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim ("Goldenheim"), its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

139.    In a statement announcing the guilty plea, John Brownlee ("Brownlee"), the U.S. Attorney for the Western District of Virginia, stated:

> Purdue claimed it had created the miracle drug – a low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse. ***Purdue's marketing campaign worked, and sales for OxyContin skyrocketed – making billions for Purdue and millions for its top executives.***
>
> But OxyContin offered no miracles to those suffering in pain. Purdue's claims that OxyContin was less addictive and less subject to abuse and diversion were false – and Purdue knew its claims were false. The result of their misrepresentations and crimes sparked one of our nation's greatest prescription drug failures. . . . OxyContin was the child of marketeers and bottom line financial decision making.[113]

140.    Brownlee characterized Purdue's criminal activity as follows:

> First, *Purdue trained its sales representatives to falsely inform health care providers that it was more difficult to extract the oxycodone from an OxyContin tablet for the purpose of intravenous abuse.* Purdue ordered this training even though its own study showed that a drug abuser could extract approximately 68% of the oxycodone from a single 10 mg OxyContin tablet by simply crushing the tablet, stirring it in water, and drawing the solution through cotton into a syringe.
>
> Second, *Purdue falsely instructed its sales representatives to inform health care providers that OxyContin could create fewer chances for addiction* than

---

[113]   Press Release, U.S. Attorney for the Western District of Virginia, Statement of United States Attorney John Brownlee on the Guilty Plea of the Purdue Frederick Company and Its Executives for Illegally Misbranding OxyContin (May 10, 2007), https://assets.documentcloud.org/ documents/279028/ purdue-guilty-plea.pdf.

immediate-release opioids.

Third, *Purdue sponsored training that falsely taught Purdue sales supervisors that OxyContin had fewer "peak and trough" blood level effects than immediate-release opioids resulting in less euphoria and less potential for abuse* than short-acting opioids.

Fourth, *Purdue falsely told certain health care providers that patients could stop therapy abruptly without experiencing withdrawal symptoms and that patients who took OxyContin would not develop tolerance to the drug.*

And fifth, *Purdue falsely told health care providers that OxyContin did not cause a "buzz" or euphoria, caused less euphoria, had less addiction potential, had less abuse potential, was less likely to be diverted than immediate-release opioids*, and could be used to "weed out" addicts and drug seekers.[114]

141. Specifically, Purdue pled guilty to illegally misbranding OxyContin in an effort to mislead and defraud physicians and consumers, while Friedman, Udell and Goldenheim pled guilty to the misdemeanor charge of misbranding OxyContin, for introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. §§331(a), 333(a)(1)-(2) and 352(a).

142. Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were effective and non-addictive. Purdue continues to aggressively market the liberal prescribing of opioids for chronic pain while diminishing the associated dangers of addiction.

143. Purdue has earned more than $31 billion from OxyContin, the nation's bestselling painkiller, which constitutes approximately 30% of the United States market for painkillers. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up threefold from 2006 sales of $800 million.[115]

144. Purdue also made thousands of payments to physicians nationwide, including to

---

[114] *Id.*

[115] Eban, *Painful Medicine*, supra n.92.

those in the New York metropolitan area for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services.

### e.      Purdue Failed to Report Suspicious Sales as Required

145.    The Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C §801 *et seq.* ("CSA" or "Controlled Substances Act"), and the regulations promulgated thereunder, 21 C.F.R. §1300 *et seq.*, imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the U.S. Drug Enforcement Administration ("DEA") field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

146.    Purdue is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### 2.      Janssen

147.    Janssen manufactures, markets, sells and distributes the following prescription opioids:

| Duragesic (fentanyl) | Opioid analgesic delivered via skin patch; contains gel form of fentanyl, a synthetic opioid that is up to 100 times more potent than morphine; delivers fentanyl at regulated rate for up to 72 hours; first approved by the FDA in August 1990. | Schedule II |
|---|---|---|
| Nucynta ER (tapentadol hydrochloride) | Opioid agonist; extended-release formulation indicated for severe pain. | Schedule II |

| Nucynta (tapentadol hydrochloride) | Immediate-release version of tapentadol hydrochloride for the management of moderate to severe acute pain. | Schedule II |

148.   Janssen introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." Janssen also markets Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older." Additionally, Janssen markets Nucynta ER, which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of . . . pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults." Janssen sold Nucynta and Nucynta ER to Depomed in 2015 for $1.05 billion.

### a.   The FDA Warned Janssen Regarding Its False Messaging

149.   On February 15, 2000, the FDA sent Janssen a letter concerning the alleged dissemination of "homemade" promotional pieces that promoted Duragesic in violation of the Federal Food, Drug, and Cosmetic Act. In a subsequent letter, dated March 30, 2000, the FDA explained that the "homemade" promotional pieces were "false or misleading because they contain misrepresentations of safety information, broaden Duragesic's indication, contain unsubstantiated claims, and lack fair balance."

150.   The March 30, 2000 letter identified specific violations, including misrepresentations that Duragesic had a low potential for abuse:

- You present the claim, "Low abuse potential!" This claim suggests that Duragesic has less potential for abuse than other currently available opioids. However, this claim has not been demonstrated by substantial evidence. Furthermore, this claim is contradictory to information in the approved product labeling (PI) that states, "Fentanyl is a Schedule II controlled substance and can produce drug dependence similar to that produced by morphine." Therefore, this claim is false or misleading.[116]

151. The March 30, 2000 letter also stated that the promotional materials represented that Duragesic was "more useful in a broader range of conditions or patients than has been demonstrated by substantial evidence." Specifically, the FDA stated that Janssen was marketing Duragesic for indications beyond the treatment of chronic pain that cannot otherwise be managed, for which it was approved:

- You present the claim, "It's not just for end stage cancer anymore!" This claim suggests that Duragesic can be used for any type of pain management. However, the PI for Duragesic states, "Duragesic (fentanyl transdermal system) is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be managed by lesser means . . . ." Therefore, the suggestion that Duragesic can be used for any type of pain management promotes Duragesic[] for a much broader use than is recommended in the PI, and thus, is misleading. In addition, the suggestion that Duragesic can be used to treat any kind of pain is contradictory to the boxed warning in the PI. Specifically, the PI states,

BECAUSE SERIOUS OR LIFE-THREATENING HYPOVENTILATION COULD OCCUR, DURAGESIC® (FENTANYL TRANSDERMAL SYSTEM) IS CONTRAINDICATED:

- In the management of acute or post-operative pain, including use in out-patient surgeries. . . .[117]

152. The March 30, 2000 letter also stated Janssen failed to adequately present "contraindications, warnings, precautions, and side effects with a prominence and readability reasonably comparable to the presentation of information relating to the effectiveness of the

---

[116] NDA 19-813 Letter from Spencer Salis, U.S. Food & Drug Administration, to Cynthia Chianese, Janssen Pharmaceutica (Mar. 30, 2000) at 2.

[117] *Id*. at 2-3.

product":

> Although this piece contains numerous claims for the efficacy and safety of Duragesic, *you have not presented any risk information* concerning the boxed warnings, contraindications, warnings, precautions, or side effects associated with Duragesic's use . . . . Therefore, this promotional piece is lacking in fair balance, or otherwise misleading, because it fails to address important risks and restrictions associated with Duragesic therapy.[118]

153.    On September 2, 2004, the U.S. Department of Health and Human Services ("HHS") sent Janssen a warning letter concerning Duragesic due to "false or misleading claims about the abuse potential and other risks of the drug, and . . . unsubstantiated effectiveness claims for Duragesic," including, specifically, "suggesting that Duragesic has a lower potential for abuse compared to other opioid products."

154.    The September 2, 2004 letter warned Janssen regarding its claims that Duragesic had a low reported rate of mentions in the Drug Abuse Warning Network ("DAWN") as compared to other opioids. The letter stated that the claim was false or misleading because the claim was not based on substantial data and because the lower rate of mentions was likely attributable to Duragesic's lower frequency of use compared to other opioids listed in DAWN:

> The file card presents the prominent claim, "Low reported rate of mentions in DAWN data," along with Drug Abuse Warning Network (DAWN) data comparing the number of mentions for Fentanyl/combinations (710 mentions) to other listed opioid products, including Hydrocodone/combinations (21,567 mentions), Oxycodone/combinations (18,409 mentions), and Methadone (10,725 mentions). The file card thus suggests that Duragesic is less abused than other opioid drugs.
>
>    This is false or misleading for two reasons. First, we are not aware of substantial evidence or substantial clinical experience to support this comparative claim. The DAWN data cannot provide the basis for a valid comparison among these products. As you know, DAWN is not a clinical trial database. Instead, it is a national public health surveillance system that monitors drug-related emergency department visits and deaths. If you have other data demonstrating that Duragesic is less abused, please submit them.

---

[118]   *Id.* at 3 (emphasis in original).

Second, Duragesic is not as widely prescribed as other opioid products. As a result, the relatively lower number of mentions could be attributed to the lower frequency of use, and not to a lower incidence of abuse. The file card fails to disclose this information.[119]

155. The September 2, 2004 letter also detailed a series of unsubstantiated, false or misleading claims regarding Duragesic's effectiveness. The letter concluded that various claims made by Janssen were insufficiently supported, including that:

- "'Demonstrated effectiveness in chronic back pain with additional patient benefits, . . . 86% of patients experienced overall benefit in a clinical study based on: pain control, disability in ADLs, quality of sleep.'"

- "'All patients who experienced overall benefit from DURAGESIC would recommend it to others with chronic low back pain.'"

- "'Significantly reduced nighttime awakenings.'"

- "'Significant improvement in disability scores as measured by the Oswestry Disability Questionnaire and Pain Disability Index.'"

- "'Significant improvement in physical functioning summary score.'"

- "'Significant improvement in social functioning.'"[120]

156. In addition, the September 2, 2004 letter identified "outcome claims [that] are misleading because they imply that patients will experience improved social or physical functioning or improved work productivity when using Duragesic." The claims include "'1,360 loaves . . . and counting,' '[w]ork, uninterrupted,' '[l]ife, uninterrupted,' '[g]ame, uninterrupted,' '[c]hronic pain relief that supports functionality,' '[h]elps patients think less about their pain,' and '[i]mprove[s] . . . physical and social functioning.'" The September 2, 2004 letter states: "Janssen has not provided references to support these outcome claims. We are not aware of

---

[119]  Warning Letter from Thomas W. Abrams, U.S. Department of Health and Human Services, to Ajit Shetty, Janssen Pharmaceutica, Inc. (Sept. 2, 2004), https://www.pharmamedtechbi.com/~/media/Images/Publications/Archive/The%20Pink%20Sheet/66/038/00660380018/040920_duragesic_letter.pdf at 2.

[120]  *Id*. at 2-3.

substantial evidence or substantial clinical experience to support these claims."[121]

157.    On July 15, 2005, the FDA issued a public health advisory warning doctors of deaths resulting from the use of Duragesic and its generic competitor, manufactured by Mylan N.V. The advisory noted that the FDA had been "'examining the circumstances of product use to determine if the reported adverse events may be related to inappropriate use of the patch'" and noted the possibility "that patients and physicians might be unaware of the risks" of using the fentanyl transdermal patch, which is a potent opioid analgesic meant to treat chronic pain that does not respond to other painkillers.

158.    Regardless, even after receiving these letters, Janssen instructed sales representatives to market Duragesic as having better efficacy, better tolerability and better patient compliance because it was a patch instead of a pill. Sales representatives were instructed to tell doctors that the patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and were also aware that some patients abused the patch by freezing, then chewing on it. When concerns about patients' application of multiple patches at once were raised in sales meeting, sales representatives were told that information about the manner in which certain patients abused Duragesic patches was not what the company wanted to focus on in communications with doctors.

### b.       Janssen Funded False Publications and Presentations

159.    Despite these repeated warnings, Janssen continued to falsely market the risks of opioids. In 2009, PriCara, a "Division of Ortho-McNeil-Janssen Pharmaceuticals, Inc.,"

---

[121] *Id*. at 3.

sponsored a 2009 brochure, "Finding Relief: Pain Management for Older Adults," aimed at potential patients. The brochure included a free DVD featuring actress Kathy Baker, who played a doctor in the popular television series "Picket Fences."

160.    The brochure represented that it was a source for older adults to gain accurate information about treatment options for effective pain relief:

> This program is aimed specifically at older adults and what they need to know to get effective pain relief. You will learn that there are many pathways to this relief.
>
> You will learn about your options for pain management and how to find the treatment that's right for you. By learning more about pain and the many ways it can be treated, you are taking solid steps toward reducing the pain you or a loved one may be feeling.[122]

161.    Despite representing itself as a source of accurate information, the brochure included false and misleading information about opioids, including a section seeking to dispel purported "myths" about opioid usage:

Opioid Myths

**Myth:** Opioid medications are always addictive.

**Fact:** Many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain.

**Myth:** Opioids make it harder to function normally.

**Fact:** When used correctly for appropriate conditions, opioids may make it *easier* for people to live normally.

**Myth:** Opioid doses have to get bigger over time because the body gets used to them.

**Fact:** Unless the underlying cause of your pain gets worse (such as with cancer or arthritis), you will probably remain on the same dose or need only small increases over time.[123]

---

[122]    *Finding Relief, Pain Management for Older Adults* (2009).

[123]    *Id*. (emphasis in original).

162.    Among the "Partners" listed in "Finding Relief: Pain Management for Older Adults" are the AAPM, the American Geriatrics Society ("AGS") and the AGS Foundation for Health in Aging. Janssen (along with Purdue and Endo) funded AAPM. The AGS and the AGS Foundation for Health in Aging published a pain guide titled "Finding Relief: Pain Management for Older Adults," which was funded by Janssen.[124]

163.    In addition, Janssen disseminated false information about opioids on the website Prescribe Responsibly, which remains publicly accessible at www.prescriberesponsibly.com. According to the website's legal notice, all content on the site "is owned or controlled by Janssen.[125] The website includes numerous false or misleading representations concerning the relative safety of opioids and omissions of the risks associated with taking them. For example, it states that while practitioners are often concerned about prescribing opioids due to "questions of addiction," such concerns "are often overestimated. According to clinical opinion polls, true addiction occurs only in a small percentage of patients with chronic pain who receive chronic opioid analgesic[] . . . therapy."[126]

164.    Prescribe Responsibly also compared the risks of opioid use favorably to those associated with nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as aspirin and ibuprofen, and stated that many patients develop tolerance for opioid side effects:

> Opioid analgesics are often the first line of treatment for many painful conditions and may offer advantages over nonsteroidal anti-inflammatory drugs (NSAIDs). Opioid analgesics, for example, have no true 'ceiling dose' for analgesia and do not cause direct organ damage; however, they do have several possible side effects, including constipation, nausea, vomiting, a decrease in sexual interest,

---

[124] *Id.*

[125] *Legal Notice*, Prescribe Responsibly, http://www.prescribe responsibly.com/legal-notice (last visited Jan. 11, 2018).

[126] *Use of Opioid Analgesics in Pain Management*, Prescribe Responsibly, http://www. prescriberesponsibly.com/ articles/opioid-pain-management (last visited Jan. 11, 2018).

drowsiness, and respiratory depression. With the exception of constipation, many patients often develop tolerance to most of the opioid analgesic-related side effects.[127]

165.    Further, Prescribe Responsibly repeats the scientifically unsupported discussion of "pseudoaddiction" as "a syndrome that causes patients to seek additional medications due to inadequate pharmacotherapy being prescribed. Typically when the pain is treated appropriately, the inappropriate behavior ceases."[128] Thus, pseudoaddiction is defined as a condition requiring the prescription of more or stronger opioids.

166.    As people became more and more hooked on prescription pain killers, they moved to heroin, and increasingly to fentanyl, which is even more potent and cheaper than heroin, and which as set forth above was being deceptively marketed by Janssen, causing a dramatic spike in heroin and fentanyl overdose deaths shown in the following graph:

---

[127]   *Id.*

[128]   *What a Prescriber Should Know Before Writing the First Prescription*, Prescribe Responsibly, http://www.prescriberesponsibly.com/articles/before-prescribing-opioids (last visited Jan. 11, 2018).



**Heroin and fentanyl overdose deaths are on the rise**

Source: National Institute on Drug Abuse

### c. Janssen Failed to Report Suspicious Sales as Required

167. The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

168. Janssen is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### 3. Endo

169.    Endo manufactures, markets, sells and distributes the following prescription opioids:

| | | |
|---|---|---|
| Opana ER (oxymorphone hydrochloride) | Opioid agonist; extended-release tablet formulation; first drug in which oxymorphone is available in an oral, extended-release formulation; first approved in 2006. | Schedule II |
| Opana (oxymorphone hydrochloride) | Opioid agonist; first approved in 2006. | Schedule II |
| Percodan (oxymorphone hydrochloride and aspirin) | Branded tablet combining oxymorphone hydrochloride and aspirin; first approved in 1950; first marketed by Endo in 2004. | Schedule II |
| Percocet (oxymorphone hydrochloride and acetaminophen) | Branded tablet that combines oxymorphone hydrochloride and acetaminophen; first approved in 1999; first marketed by Endo in 2006. | Schedule II |
| Oxycodone | Generic product. | Schedule II |
| Oxymorphone | Generic product. | Schedule II |
| Hydromorphone | Generic product. | Schedule II |
| Hydrocodone | Generic product. | Schedule II |

170.    The FDA first approved an injectable form of Opana in 1959. The injectable form of Opana was indicated "for the relief of moderate to severe pain" and "for preoperative medication, for support of anesthesia, for obstetrical analgesia, and for relief of anxiety in patients with dyspnea associated with pulmonary edema secondary to acute left ventricular dysfunction." However, oxymorphone drugs were removed from the market in the 1970s due to

widespread abuse.[129]

171.    In 2006, the FDA approved a tablet form of Opana in 5 mg and 10 mg strengths. The tablet form was "indicated for the relief of moderate to severe acute pain where the use of an opioid is appropriate." Also in 2006, the FDA approved Opana ER, an extended-release tablet version of Opana available in 5 mg, 10 mg, 20 mg and 40 mg tablet strengths. Opana ER was indicated "for the relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time." Endo's goal was to use Opana ER to take market share away from OxyContin; thus it was marketed as being safer, with less abuse potential than OxyContin because of its crush-resistance.

172.    According to Endo's annual reports, sales of Opana and Opana ER regularly generate several hundred million dollars in annual revenue for the company, growing from $107 million in 2007 to as high as $384 million in 2011. Over the last ten years, Percocet has generated an average of well over $100 million in annual revenue for the company.

### a.    Endo Falsely Marketed Opana ER as Crush Resistant

173.    In December 2011, the FDA approved a reformulated version of Opana ER, which Endo claimed offered "safety advantages" over the original formulation because the latter "'is resistant to crushing by common methods and tools employed by abusers of prescription opioids . . . [and] is less likely to be chewed or crushed even in situations where there is no intent for abuse, such as where patients inadvertently chew the tablets, or where caregivers attempt to crush the tablets for easier administration with food or by gastric tubes, or where children accidentally gain access to the tablets.'"

---

[129]    John Fauber & Kristina Fiore, *Opana gets FDA approval despite history of abuse, limited effectiveness in trials*, Milwaukee Journal Sentinel (May 9, 2015), http://archive.jsonline.com/watchdog/watchdogreports/opana-gets-fda-approval-despite-history-of-abuse-limited-effectiveness-in-trials-b99494132z1-303198321.html/.

174.    Endo publicized the reformulated version of Opana ER as "crush-resistant." To combat the fear of opioids, sales representatives touted it to doctors as a safer option due to its crush-resistance and extended release. In a December 12, 2011, press release announcing FDA approval of the reformulated Opana ER, Endo's executive vice president for research and development and chief scientific officer highlighted the reformulated version's safety characteristics:

> FDA's approval of this new formulation of Opana ER is an important milestone for both the Long Acting Opioid category as well as Endo's branded pharmaceutical portfolio. . . . Patient safety is our top concern and addressing appropriate use of opioids is a responsibility that we take very seriously. We firmly believe this new formulation of Opana ER, coupled with our long-term commitment to awareness and education around appropriate use of opioids will benefit patients, physicians and payers.

175.    However, in October 2012, the CDC issued a health alert noting that 15 people in Tennessee had contracted thrombotic thrombocytopenic purpura, a rare blood-clotting disorder, after injecting reformulated Opana ER. In response, Endo's chief scientific officer stated that, while Endo was looking into the data, he was not especially concerned: "'Clearly, we are looking into this data, . . . but it's in a very, very distinct area of the country.'"[130]

176.    Shortly thereafter, the FDA determined that Endo's conclusions about the purported safety advantages of the reformulated Opana ER were unfounded. In a May 10, 2013 letter to Endo, the FDA found that the tablet was still vulnerable to "'cutting, grinding, or chewing,'" "'can be prepared for insufflation (snorting) using commonly available tools and methods,'" and "'can [be readily] prepared for injection.'" It also warned that preliminary data suggested "the troubling possibility that a higher percentage of reformulated Opana ER abuse is

---

[130]   Jake Harper & Kelly McEvers, *How A Painkiller Designed To Deter Abuse Helped Spark An HIV Outbreak*, National Public Radio (Apr. 1, 2016), http://www.npr.org/sections/health-shots/2016/04/01/472538272/how-a-painkiller-designed-to-deter-abuse-helped-spark-an-hiv-outbreak.

via injection than was the case with the original formulation."

177.   A 2014 study co-authored by an Endo medical director corroborated the FDA's warning. This 2014 study found that while overall abuse of Opana had fallen following Opana ER's reformulation, it also found that injection had become the preferred way of abusing the drug.[131] However, the study reassured that it was not possible to draw a causal link between the reformulation and injection abuse.

178.   The study's failure to adequately warn healthcare providers and the public was catastrophic. On April 24, 2015, the CDC issued a health advisory concerning its investigation of "a large outbreak of recent human immunodeficiency virus (HIV) infections among persons who inject drugs."[132] The CDC specifically attributed the outbreak to the injection of Opana ER. As the advisory explained:

> From November 2014 to January 2015, ISDH identified 11 new HIV infections in a rural southeastern county where fewer than 5 infections have been identified annually in the past. As of April 21, 2015, an on-going investigation by ISDH with assistance from CDC has identified 135 persons with newly diagnosed HIV infections in a community of 4,200 people; 84% were also HCV infected. Among 112 persons interviewed thus far, 108 (96%) injected drugs; all reported dissolving and injecting tablets of the prescription-type opioid oxymorphone (OPANA® ER) using shared drug preparation and injection equipment.[133]

### b.   New York's Investigation Found Endo Falsely Marketed Opana ER

179.   On February 18, 2017, the State of New York announced a settlement with Endo requiring it "to cease all misrepresentations regarding the properties of Opana ER [and] to

---

[131]   *Id.*

[132]   *Outbreak of Recent HIV and HCV Infections Among Persons Who Inject Drugs*, Centers for Disease Control and Prevention, https://emergency.cdc.gov/han/han00377.asp (last visited Jan. 11, 2018).

[133]   *Id.*

describe accurately the risk of addiction to Opana ER."[134] In the Assurance of Discontinuance that effectuated the settlement, the State of New York revealed evidence showing that Endo had known about the risks arising from the reformulated Opana ER even before it received FDA approval.

180.   Among other things, the investigation concluded that:

- Endo improperly marketed Opana ER as designed to be crush resistant, when Endo's own studies dating from 2009 and 2010 showed that the pill could be crushed and ground;

- Endo improperly instructed its sales representatives to diminish and distort the risks associated with Opana ER, including the serious danger of addiction; and

- Endo made unsupported claims comparing Opana ER to other opioids and failed to disclose accurate information regarding studies addressing the negative effects of Opana ER.

181.   In October 2011, Endo's director of project management e-mailed the company that had developed the formulation technology for reformulated Opana ER to say there was little or no difference between the new formulation and the earlier formulation, which Endo withdrew due to risks associated with grinding and chewing:

We already demonstrated that there was little difference between [the original and new formulations of Opana] in Study 108 when both products were ground. FDA deemed that there was no difference and this contributed to their statement that we had not shown an incremental benefit. The chewing study (109) showed the same thing no real difference which the FDA used to claim no incremental benefit.[135]

---

[134]   Press Release, Attorney General Eric T. Schneiderman, A.G. Schneiderman Announces Settlement With Endo Health Solutions Inc. & Endo Pharmaceuticals Inc. Over Marketing Of Prescription Opioid Drugs (Mar. 3, 2016), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-endo-health-solutions-inc-endo-pharmaceuticals.

[135]   *In the Matter of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.*, Assurance No. 15-228, Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 5 (Mar. 1, 2016), https://ag.ny.gov/pdfs/Endo_ AOD_030116-Fully_Executed.pdf.

182.     Endo conducted two additional studies to test the reformulated Opana ER's crush resistance. Study 901 tested whether it was more difficult to extract reformulated Opana ER than the original version, and whether it would take longer to extract from reformulated Opana ER than from the original version. The test revealed that both formulations behaved similarly with respect to manipulation time and produced equivalent opioid yields.

183.     The settlement also identified and discussed a February 2013 communication from a consultant hired by Endo to the company, in which the consultant concluded that "'[t]he initial data presented do not necessarily establish that the reformulated Opana ER is tamper resistant.'" The same consultant also reported that the distribution of the reformulated Opana ER had already led to higher levels of abuse of the drug via injection.[136]

184.     Regardless, pamphlets produced by Endo and distributed to physicians misleadingly marketed the reformulated Opana ER as "'designed to be' crush resistant," and Endo's sales representative training identified Opana ER as "CR," short for crush resistant.[137] The Office of the Attorney General of New York also revealed that the "managed care dossier" Endo provided to formulary committees of healthcare plans and pharmacy benefit managers misrepresented the studies that had been conducted on Opana ER. The dossier was distributed in order to assure the inclusion of reformulated Opana ER in their formularies.

185.     According to Endo's vice president for pharmacovigilance and risk management, the dossier was presented as a complete compendium of all research on the drug. However, it omitted certain studies: Study 108 (completed in 2009) and Study 109 (completed in 2010), which showed that reformulated Opana ER could be ground and chewed.

---

[136] *Id.* at 6.

[137] *Id.*

186.     The settlement also detailed Endo's false and misleading representations about the non-addictiveness of opioids and Opana. Until April 2012, Endo's website for the drug, www.opana.com, contained the following representation: "'Most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted.'"[138] However, Endo neither conducted nor possessed a survey demonstrating that most healthcare providers who treat patients with pain agree with that representation.

187.     The New York Attorney General also disclosed that training materials provided by Endo to sales representatives stated: "Symptoms of withdrawal do not indicate addiction."[139] This representation is inconsistent with the diagnosis of opioid-use disorder as provided in the Diagnostic and Statistical Manual of Mental Disorders by the American Psychiatric Association (Fifth Edition).

188.     The New York Attorney General also found that Endo trained its sales representatives to falsely distinguish addiction from "pseudoaddiction," which it defined as a condition in which patients exhibit drug-seeking behavior that resembles but is not the same as addiction. However, Endo's vice president for pharmacovigilance and risk management testified that he was not aware of any research validating the concept of pseudoaddiction.

189.     On June 9, 2017, the FDA asked Endo to voluntarily cease sales of Opana ER after determining that the risks associated with its abuse outweighed the benefits. According to Dr. Janet Woodcock, director of the FDA's Center for Drug Evaluation and Research, the risks include "several serious problems," including "outbreaks of HIV and Hepatitis C from sharing the drug after it was extracted by abusers" and "a[n] outbreak of serious blood disorder." If Endo

---

[138] *Id.*

[139] *Id.* at 7.

does not comply with the request, Dr. Woodcock stated that the FDA would issue notice of a hearing and commence proceedings to compel its removal.

### c.    Endo Funded False Publications and Presentations

190.    Like several of the other Manufacturing Defendants, Endo provided substantial funding to purportedly neutral medical organizations, including APF.

191.    For example, in April 2007, Endo sponsored an article aimed at prescribers, written by Dr. Charles E. Argoff in *Pain Medicine News*, titled "Case Challenges in Pain Management: Opioid Therapy for Chronic Pain."[140]

192.    The article commenced with the observation that "[a]n estimated 50 to 60 million people . . . suffer from chronic pain." It continued:

> Opioids represent a highly effective but controversial and often misunderstood class of analgesic medications for controlling both chronic and acute pain. The phenomenon of tolerance to opioids – the gradual waning of relief at a given dose – and fears of abuse, diversion, and misuse of these medications by patients have led many clinicians to be wary of prescribing these drugs, and/or to restrict dosages to levels that may be insufficient to provide meaningful relief.[141]

193.    The article included a case study that focused on the danger of extended use of NSAIDs, including that the subject was hospitalized with a massive upper gastrointestinal bleed believed to have resulted from his protracted NSAID use. In contrast, the article did not provide the same detail concerning the serious side effects associated with opioids. It concluded by saying that "use of opioids may be effective in the management of chronic pain."

194.    Later, in 2014, Endo issued a patient brochure titled "Understanding Your Pain: Taking Oral Opioid Analgesics." It was written by nurses Margo McCaffery and Chris Pasero and edited by APF board member Portenoy.

---

[140]    Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News, http://www.painmedicinenews.com/download/ BtoB_Opana_WM.pdf.

[141]    *Id.*

195.    The brochure included numerous false and misleading statements minimizing the dangers associated with prescription opioid use. Among other things, the brochure falsely and misleadingly represented that:

Addiction **IS NOT** when a person develops "withdrawal" (such as abdominal cramping or sweating) after the medicine is stopped quickly or the dose is reduced by a large amount. Your doctor will avoid stopping your medication suddenly by slowly reducing the amount of opioid you take before the medicine is completely stopped. Addiction also **IS NOT** what happens when some people taking opioids need to take a higher dose after a period of time in order for it to continue to relieve their pain. This normal "tolerance" to opioid medications doesn't affect everyone who takes them and does not, by itself, imply addiction. If tolerance does occur, it does not mean you will "run out" of pain relief. Your dose can be adjusted or another medicine can be prescribed.

*        *        *

*How can I be sure I'm not addicted?*

- Addiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problems.

- Ask yourself: Would I want to take this medicine if my pain went away? If you answer no, you are taking opioids for the right reasons – to relieve your pain and improve your function. You are not addicted.

*        *        *

Your doctor or nurse may instruct you to do some of the following:

- Take the next dose before the last dose wears off. If pain is present most of the day and night, the pain medicine may be taken at regularly scheduled times. If you are taking a short-acting opioid, this usually means taking it every 4 hours. You may need to set your alarm, especially at night, to be sure you take your dose before the pain returns and wakes you up.

- If your pain comes and goes, take your pain medicine when pain first begins, before it becomes severe.

- If you are taking a long-acting opioid, you may only need to take it every 8 to 12 hours, but you may also need to take a short-acting opioid in

between for any increase in pain.[142]

196.    In 2008, Endo also provided an "educational grant" to PainEDU.org, which produced a document titled "Screener and Opioid Assessment for Patients with Pain (SOAPP) Version 1.0-14Q." Endo and King Pharmaceuticals sponsor PainEDU.org.[143] SOAPP describes itself "as a tool for clinicians to help determine how much monitoring a patient on long-term opioid therapy might require." It falsely highlights purportedly "recent findings suggesting that most patients are able to successfully remain on long-term opioid therapy without significant problems."

197.    Endo also sponsored the now-defunct website painknowledge.com, which was created by APF and stated it was "a one-stop repository for print materials, educational resources, and physician tools across the broad spectrum of pain assessment, treatment, and management approaches."[144] Among other featured content, painknowledge.com included a flyer titled "Pain: Opioid Therapy," which failed to warn of significant adverse effects that could arise from opioid use, including hyperalgesia, immune and hormone dysfunction, cognitive impairment, decreased tolerance, dependence and addiction.

198.    Endo, along with Janssen and Purdue, also provided grants to APF to distribute Exit Wounds, discussed above.[145]

---

[142]  Margo McCaffery & Chris Pasero, *Understanding Your Pain: Taking Oral Opioid Analgesics*, Endo Pharmaceuticals (2004), http://www.thblack.com/links/RSD/Understand_Pain_ Opioid_Analgesics.pdf (emphasis in original).

[143]  B. Eliot Cole, *Resources for Education on Pain and Its Management: A Practitioner's Compendium* 2 (Am. Society of Pain Educators 2009), https://www.paineducators.org/wp-content/uploads/2012/12/ASPE-ResForEducationOnPainAn.pdf.

[144]  AboutPainKnowledge.org, PainKnowledge, http://web.archive.org/web/20120119124921/http://www.painknowledge.org/aboutpaink.aspx (last visited Jan. 11, 2018).

[145]  *Iraq War Veteran Amputee, Pain Advocate and New Author Release Exit Wounds: A Survival Guide to Pain Management for Returning Veterans and Their Families*, Coalition for Iraq + Afghanistan

199.    Endo also made thousands of payments to physicians nationwide for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services. While some of the doctors who participated were clearly engaged in problematic prescribing of opioids, at no time were sales representatives provided a do not call list of problematic prescribers. During 2015 and 2016, sales representatives of Endo opioids were trained to put their heads down and ignore problematic remarks from doctors and their staff regarding their prescription practices.

### d.    FDA Requests Endo Withdraw Opana ER Due to the Public Health Consequences of Abuse

200.    On June 8, 2017, the FDA requested that Endo remove reformulated Opana ER from the market "based on its concern that the benefits of the drug may no longer outweigh its risks."[146] According to the FDA's press release, it sought removal "due to the public health consequences of abuse." The decision to seek Opana ER's removal from sale followed a March 2017 FDA advisory committee meeting, during which a group of independent experts voted 18-8 that the drug's benefits no longer outweigh the risks associated with its use. Should Endo choose not to remove Opana ER due to the FDA's request, the agency stated that it will take steps to formally require its removal by withdrawing approval.

### e.    Endo Failed to Report Suspicious Sales as Required

201.    The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the

---

Veterans, https://web.archive.org/web/20160804131030/http://coalitionforveterans.org/ 2009/10/ iraq-war- veteran-amputee-pain-advocate-and-new-author-releases-exit-wounds-a-survival-guide-to-pain-management-for-returning-veterans-and-their-families/ (last visited Jan. 11, 2018).

[146]   Press Release, U.S. Food & Drug Administration, FDA requests removal of Opana ER for risks related to abuse (June 8, 2017), https://www.fda.gov/newsevents/newsroom/pressannouncements/ucm562401.htm.

registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

202.    Endo is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### 4.    Cephalon

203.    Cephalon manufactures, markets, sells and distributes the following prescription opioids:

| Actiq (fentanyl citrate) | Opioid analgesic; oral transmucosal lozenge; indicated only for the management of breakthrough pain (or "BTP") in cancer patients – pain that for a short time "breaks through" medication that otherwise effectively controls a patient's persistent pain – in patients 16 and older with malignancies; commonly referred to as a lollipop because designed to look and perform like one; approved in 1998 with restricted distribution program. | Schedule II |
|---|---|---|
| Fentora (fentanyl buccal) | Rapid-release tablet for BTP in cancer patients who are already receiving and tolerant of around-the-clock opioid therapy; approved 2006. | Schedule II |
| Generic of OxyContin (oxycodone hydrochloride) | Opiate agonist. | Schedule II |

204.    Actiq is designed to resemble a lollipop and is meant to be sucked on at the onset of intense BTP in cancer patients. It delivers fentanyl citrate, a powerful opioid agonist that is 80

times stronger than morphine, [147] rapidly into a patient's bloodstream through the oral membranes. [148] Because it is absorbed through those membranes, it passes directly into circulation without having to go through the liver or stomach, thereby providing faster relief.[149]

205.   In November 1998, the FDA approved Actiq for only a very narrow group of people – cancer patients "with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[150]

206.   Understanding the risks of introducing such an intense opioid analgesic to the market, the FDA provided approval of Actiq "***ONLY*** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[151] Further, the FDA explicitly stated that Actiq "***must not*** be used in opioid non-tolerant patients," was contraindicated for the management of acute or postoperative pain, could be deadly to children and was "intended to be used only in the care of opioid-tolerant cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain."

207.   The FDA also required that Actiq be provided only in compliance with a strict

---

[147]   *See* John Carreyrou, *Narcotic "Lollipop" Becomes Big Seller Despite FDA Curbs*, Wall St. J. (Nov. 3, 2006), https://www.opiates.com/media/narcotic-lollipop-becomes-big-seller-despite-fda-curbs/ (hereinafter "Carreyrou, *Narcotic Lollipop*").

[148]   Actiq would later become part of a category of opioids now known as transmucosal immediate-release fentanyl ("TIRF") products. "Transmucosal" refers to the means through which the opioid is delivered into a patient's bloodstream, across mucous membranes, such as inside the cheek, under the tongue or in the nose.

[149]   Cephalon, Inc., Company-Histories.com, http://www.company-histories.com/Cephalon-Inc-Company- History.html (last visited Jan. 11, 2018).

[150]   1998 FDA Label.

[151]   NDA 20-747 Letter from Cynthia McCormick, Center for Drug Evaluation and Research, to Patricia J. Richards, Anesta Corporation, http://www.accessdata.fda.gov/drugsatfda_docs/appletter/1998/20747ltr.pdf.

risk-management program that explicitly limited the drug's direct marketing to the approved target audiences, defined as oncologists, pain specialists, their nurses and office staff.[152]

208.    In October 2000, Cephalon acquired the worldwide product rights to Actiq and began marketing and selling Actiq in the United States.

209.    Cephalon purchased the rights to Fentora, an even faster-acting tablet formulation of fentanyl, from Cima Labs, and submitted a new drug application to the FDA in August 2005. In September 2006, Cephalon received FDA approval to sell this faster-acting version of Actiq; but once again, concerned about the power and risks inherent to fentanyl, the FDA limited Fentora's approval to the treatment of BTP in cancer patients who were already tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain. Cephalon began marketing and selling Fentora in October 2006.

### a.   Cephalon Aggressively Marketed Cancer Drug to Non-Cancer Treating Physicians

210.    Due to the FDA's restrictions, Actiq's consumer base was limited, as was its potential for growing revenue. In order to increase its revenue and market share, Cephalon needed to find a broader audience and thus began marketing its lollipop to treat headaches, back pain, sports injuries and other chronic non-cancer pain, targeting non-oncology practices, including, but not limited to, pain doctors, general practitioners, migraine clinics, anesthesiologists and sports clinics. It did so in violation of applicable regulations prohibiting the marketing of medications for off-label use and in direct contravention of the FDA's strict instructions that Actiq be prescribed only to terminal cancer patients and by oncologists and pain management doctors experienced in treating cancer pain.

211.    According to "[d]ata gathered from a network of doctors by research firm

---

[152]   Carreyrou, *Narcotic Lollipop*, *supra* n.147.

ImpactRx between June 2005 and October 2006" ("ImpactRx Survey"), Cephalon sales representatives' visits to non-oncologists to pitch Actiq increased sixfold between 2002 and 2005. Cephalon representatives would reportedly visit non-oncologists monthly, providing up to 60 or 70 coupons (each coupon was good for six free Actiq lozenges) and encouraging prescribers to try Actiq on their non-cancer patients.[153]

212.   Cephalon's efforts paid off. In 2000, Actiq generated $15 million in sales.[154] By 2002, it attributed a 92% increase in Actiq sales to "a dedicated sales force for ACTIQ" and "ongoing changes to [its] marketing approach including hiring additional sales representatives and targeting our marketing efforts to pain specialists."[155] By 2005, Actiq's sales total had jumped to $412 million, making it (a drug approved for only a narrow customer base) Cephalon's second-bestselling drug. By the end of 2006, Actiq's sales had exceeded $500 million.[156]

213.   Only 1% of the 187,076 prescriptions for Actiq filled at retail pharmacies during the first six months of 2006 were prescribed by oncologists. Results of the ImpactRx Survey suggested that "more than 80 percent of patients who use[d] the drug don't have cancer."[157]

**b.   Government Investigations Found Cephalon Falsely Marketed Actiq for Off-Label Uses**

214.   Beginning in or about 2003, former Cephalon employees filed four whistleblower lawsuits claiming the company had wrongfully marketed Actiq for unapproved, off-label uses.

---

[153]   *Id.*

[154]   *Id.*

[155]   Cephalon, Inc. Annual Report (Form 10-K) (Mar. 31, 2003), https://www.sec.gov/Archives/edgar/data/ 873364/000104746903011137/a2105971z10-k.htm at 28.

[156]   Carreyrou, *Narcotic Lollipop, supra* n.147.

[157]   *Id.*

On September 29, 2008, Cephalon finalized and entered into a corporate integrity agreement with the Office of the Inspector General of HHS and agreed to pay $425 million in civil and criminal penalties for its off-label marketing of Actiq and two other drugs (Gabitril and Provigil). According to a DOJ press release, Cephalon trained sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of the three drugs and funded CME to promote off-label uses. Specifically, the DOJ stated:

> From 2001 through at least 2006, Cephalon was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. Cephalon also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.[158]

215.    Then-acting U.S. Attorney Laurie Magid commented on the dangers of Cephalon's unlawful practices:

> This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.[159]

216.    Upon information and belief, documents uncovered in the government's investigations confirm that Cephalon directly targeted non-oncology practices and pushed its sales representatives to market Actiq for off-label use. For instance, the government's investigations confirmed:

- • Cephalon instructed its sales representatives to ask non-cancer doctors whether they have the potential to treat cancer pain. Even if the doctor

---

[158]   *Pharmaceutical Company Cephalon To Pay $425 Million For Off-Label Drug Marketing*, Press Release, U.S. Department of Justice, (Sept. 29, 2008), https://www.justice.gov/archive/usao/pae/News/2008/sep/cephalonrelease.pdf.

[159]   *Id.*

answered "no," a decision tree provided by Cephalon instructed the sales representatives to give these physicians free Actiq coupons;

- Cephalon targeted neurologists in order to encourage them to prescribe Actiq to patients with migraine headaches;

- Cephalon sales representatives utilized the assistance of outside pain management specialists when visiting non-cancer physicians to pitch Actiq. The pain management specialist would falsely inform the physician that Actiq does not cause patients to experience a "high" and carries a low risk of diversion toward recreational use;

- Cephalon set sales quotas for its sales and marketing representatives that could not possibly have been met solely by promoting Actiq for its FDA-approved indication;

- Cephalon promoted the use of higher doses of Actiq than patients required by encouraging prescriptions of the drug to include larger-than-necessary numbers of lozenges with unnecessarily high doses of fentanyl; and

- Cephalon promoted Actiq for off-label use by funding and controlling CME seminars that promoted and misrepresented the efficacy of the drug for off-label uses such as treating migraine headaches and for patients not already opioid-tolerant.[160]

217.     Still, the letters, the FDA's safety alert, DOJ and state investigations and the massive settlement seemed to have had little impact on Cephalon as it continued its deceptive marketing strategy for both Actiq and Fentora.

## c.     Cephalon Focused on Non-Cancer Treating Physicians in Falsely Marketing Fentora

218.     From the time it first introduced Fentora to the market in October 2006, Cephalon targeted non-cancer doctors, falsely represented Fentora as a safe, effective off-label treatment for non-cancer pain and continued its disinformation campaign about the safety and non-addictiveness of Fentora specifically and opioids generally. In fact, Cephalon targeted the same pain specialists and non-oncologists that it had targeted with its off-label marketing of Actiq,

---

[160]  John Carreyrou, *Cephalon Used Improper Tactics to Sell Drug, Probe Finds*, Wall St. J., Nov. 21, 2006, at B1 (hereinafter "Carreyrou, *Cephalon Used Improper Tactics*").

simply substituting Fentora.

219.   During an investor earnings call shortly after Fentora's launch, Cephalon's chief executive officer ("CEO") described the "opportunity" presented by the use of Fentora for non-cancer pain:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain.

*       *       *

> Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain. In contrast only 12% are taking them to treat cancer pain, 12%.

> We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA. And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and well being and the exciting growth potential that it has for Cephalon.

> In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively. Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years. In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[161]

### d.   The FDA Warned Cephalon Regarding its False and Off-Label Marketing of Fentora

220.   On September 27, 2007, the FDA issued a public health advisory to address numerous reports that patients who did not have cancer or were not opioid tolerant had been prescribed Fentora, and death or life-threatening side effects had resulted. The FDA warned: "Fentora should not be used to treat any type of short-term pain."[162]

---

[161]   Seeking Alpha, Transcript of Q1 2007 Cephalon, Inc. Earnings Conference Call, May 1, 2007, http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript?all=true&find=Q1%2B2007%2BCephalon%2BMay%2B1%2C%2B2007 at 6-7.

[162]   Public Health Advisory: Important Information for the Safe Use of Fentora (fentanyl buccal tablets), Press Release, U.S. Food & Drug Administration, (Sept. 26, 2007), https://www.fda.gov/Drugs/

221.    Nevertheless, in 2008, Cephalon pushed forward to expand the target base for Fentora and filed a supplemental drug application requesting FDA approval of Fentora for the treatment of non-cancer BTP. In the application and supporting presentations to the FDA, Cephalon admitted both that it knew the drug was heavily prescribed for off-label use and that the drug's safety for such use had never been clinically evaluated.[163] An FDA advisory committee lamented that Fentora's existing risk management program was ineffective and stated that Cephalon would have to institute a risk evaluation and mitigation strategy for the drug before the FDA would consider broader label indications. In response, Cephalon revised Fentora's label and medication guide to add strengthened warnings.

222.    But in 2009, the FDA once again informed Cephalon that the risk management program was not sufficient to ensure the safe use of Fentora for already approved indications.

223.    On March 26, 2009, the FDA warned Cephalon against its misleading advertising of Fentora ("Warning Letter"). The Warning Letter described a Fentora Internet advertisement as misleading because it purported to broaden "the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora . . . when this is not the case." Rather, Fentora was only indicated for those who were already opioid tolerant. It further criticized Cephalon's other direct Fentora advertisements because they did not disclose the risks associated with the drug.

224.    Flagrantly disregarding the FDA's refusal to approve Fentora for non-cancer BTP and its warning against marketing the drug for the same, Cephalon continued to use the same

---

DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm051273.htm.

[163]    FENTORA (fentanyl buccal tablet) CII, Joint Meeting of Anesthetic and Life Support Drugs and Drug Safety and Risk Management Advisory Committee, U.S. Food & Drug Administration (May 6, 2008), https://www.fda.gov/ohrms/dockets/ac/08/slides/2008-4356s2-03-Cephalon.pdf.

sales tactics to push Fentora as it did with Actiq.

225.    For example, on January 13, 2012, Cephalon published an insert in *Pharmacy Times* titled "An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Buccal Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)." Despite the repeated warnings of the dangers associated with the use of the drugs beyond their limited indication, as detailed above, the first sentence of the insert states: "It is well recognized that the judicious use of opioids can facilitate effective and safe management of chronic pain."[164]

### e.    Cephalon Funded False Publications and Presentations

226.    In addition to its direct marketing, Cephalon indirectly marketed through third parties to change the way doctors viewed and prescribed opioids – disseminating the unproven and deceptive messages that opioids were safe for the treatment of chronic, long-term pain, that they were non-addictive and that they were woefully under-prescribed to the detriment of patients who were needlessly suffering. It did so by sponsoring pro-opioid front groups, misleading prescription guidelines, articles and CMEs, and it paid physicians thousands of dollars every year to publicly opine that opioids were safe, effective and non-addictive for a wide variety of uses.

227.    Cephalon sponsored numerous CMEs, which were made widely available through organizations like Medscape, LLC ("Medscape") and which disseminated false and misleading information to physicians..

228.    For    example,    a    2003    Cephalon-sponsored    CME    presentation    titled

---

[164]  *An Integrated Risk Evaluation and Mitigation Strategy (REMS) for FENTORA (Fentanyl Bucall Tablet) and ACTIQ (Oral Transmucosal Fentanyl Citrate)*, Pharmacy Times (Jan. 13, 2012), http://www.pharmacytimes.com/publications/issue/2012/january2012/r514-jan-12-rems.

"Pharmacologic Management of Breakthrough or Incident Pain," posted on Medscape in February 2003, teaches:

> [C]hronic pain is often undertreated, particularly in the noncancer patient population. . . . The continued stigmatization of opioids and their prescription, coupled with often unfounded and self-imposed physician fear of dealing with the highly regulated distribution system for opioid analgesics, remains a barrier to effective pain management and must be addressed. Clinicians intimately involved with the treatment of patients with chronic pain recognize that the majority of suffering patients lack interest in substance abuse. In fact, patient fears of developing substance abuse behaviors such as addiction often lead to undertreatment of pain. The concern about patients with chronic pain becoming addicted to opioids during long-term opioid therapy may stem from confusion between physical dependence (tolerance) and psychological dependence (addiction) that manifests as drug abuse.[165]

229.    Another Cephalon-sponsored CME presentation titled "Breakthrough Pain: Treatment Rationale with Opioids" was available on Medscape starting September 16, 2003 and was given by a self-professed pain management doctor who "previously operated back, complex pain syndromes, the neuropathies, and interstitial cystitis." He describes the pain process as a non-time-dependent continuum that requires a balanced analgesia approach using "targeted pharmacotherapeutics to affect multiple points in the pain-signaling pathway."[166] The doctor lists fentanyl as one of the most effective opioids available for treating BTP, describing its use as an expected and normal part of the pain management process. Nowhere in the CME is cancer or cancer-related pain even mentioned.

230.    Dr. Stephen H. Landy ("Landy") authored a 2004 CME available on Medscape titled "Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series." The manuscript preparation was supported by Cephalon. Landy

---

[165]  Michael J. Brennan, *et al.*, *Pharmacologic Management of Breakthrough or Incident Pain*, Medscape, http://www.medscape.org/viewarticle/449803.

[166]   Daniel S. Bennett, *Breakthrough Pain: Treatment Rationale With Opioids*, Medscape, http://www.medscape.org/viewarticle/461612.

describes the findings of a study of fentanyl citrate for the use of migraine headache pain and concluded that "OTFC rapidly and significantly relieved acute, refractory migraine pain in outpatients . . . and was associated with high patient satisfaction ratings."[167] Based on an analysis of publicly available data, Cephalon paid Landy approximately $190,000 in 2009-2010 alone, and in 2015-2016, Cephalon paid Landy another $75,000.

231.    In 2006, Cephalon sponsored a review of scientific literature to create additional fentanyl-specific dosing guidelines titled "Evidence-Based Oral Transmucosal Fentanyl Citrate (OTFC®) Dosing Guidelines."[168] The article purports to review the evidence for dosing and efficacy of oral transmucosal fentanyl citrate in the management of pain and produce dosing guidelines in both cancer and non-cancer patients. In pertinent part, it states:

> Oral transmucosal fentanyl citrate has a proven benefit in treating cancer-associated breakthrough pain in opioid-tolerant patients with cancer, which is the Food and Drug Administration (FDA)-approved indication for Actiq. Pain medicine physicians have also used OTFC successfully to provide rapid pain relief in moderate to severe noncancer pain in both opioid-tolerant and opioid-nontolerant patients.[169]

232.    Later in the article, the authors attempted to assuage doctors' concerns regarding possible overdose and respiratory distress in non-cancer patients, arguing "*[t]here is no evidence that opioid safety and efficacy differs in opioid-tolerant patients with chronic noncancer pain*."

233.    Regarding the use of fentanyl to treat non-opioid-tolerant patients, the authors claimed:

---

[167]  Stephen H. Landy, *Oral Transmucosal Fentanyl Citrate for the Treatment of Migraine Headache Pain In Outpatients: A Case Series*, 44(8) Headache (2004), http://www.medscape.com/viewarticle/488337_2.

[168]  Gerald M. Aronoff, et al., *Evidence-Based Oral Transmucosal Fentanyl Citrate (OTFC) Dosing Guidelines*, 6(4) Pain Med. 305-14 (Aug. 2005).

[169]  *Id.*

Alternatively, OTFC might also be used cautiously and safely for acute pain experienced by patients who are not opioid tolerant. Parenteral opioids are routinely used for acute pain in patients who are not opioid tolerant. Examples include episodic pain (i.e., refractory migraine pain, recurrent renal calculi, etc.) and acute pain that follows surgery, trauma, or painful procedures (burn dressing change, bone marrow aspiration, lumbar puncture). Assuming that clinical experience with IV morphine in patients who are not opioid tolerant can be extrapolated, OTFC should be safe and efficacious in such settings as well.[170]

234.     Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide" (as alleged above), Cephalon continued to encourage the prescribing of opioid medication to "reverse . . . and improve" patient function, attributing patients' displays of traditional drug-seeking behaviors as merely "pseudoaddiction."

235.     Cephalon also disseminated its false messaging through speakers' bureaus and publications. For example, at an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain (BTP), yet no currently available pharmacologic agent is ideal for its treatment." The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP."

236.     Cephalon sponsored another CME written by Webster and M. Beth Dove titled "Optimizing Opioid Treatment for Breakthrough Pain" and offered on Medscape from September 28, 2007 through December 15, 2008. The CME teaches that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less

---

[170]  *Id.*

effective at treating BTP than pure opioid analgesics because of dose limitations on the non-opioid component.[171]

237. Fine authored a Cephalon-sponsored CME titled "Opioid-Based Management of Persistent and Breakthrough Pain," with Drs. Christine A. Miaskowski and Michael J. Brennan. Cephalon paid to have this CME published in a "Special Report" supplement of the journal *Pain Medicine News* in 2009.[172] The CME targeted a wide variety of non-oncologist healthcare providers who treat patients with chronic pain with the objective of educating "health care professionals about a semi-structured approach to the opioid-based management of persistent and breakthrough pain," including the use of fentanyl. The CME purports to analyze the "combination of evidence- and case-based discussions" and ultimately concludes:

> Chronic pain is a debilitating biopsychosocial condition prevalent in both cancer and noncancer pain populations. . . . Opioids have an established role in pain related to cancer and other advanced medical illnesses, as well as an increasing contribution to the long-term treatment of carefully selected and monitored patients with certain [chronic noncancer pain] conditions. All individuals with chronic, moderate to severe pain associated with functional impairment should be considered for a trial or opioid therapy, although not all of them will be selected.[173]

238. Together with Purdue, Cephalon sponsored APF's guide (*see supra* ¶¶7071), which warned against the purported ***under***-prescribing of opioids, taught that addiction is ***rare*** and suggested that opioids have "***no ceiling dose***" and are therefore the most appropriate treatment for severe pain.

239. A summary of the February 12-16, 2008 AAPM annual meeting reinforced the

---

[171] Lynn Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, Medscape, http://www.medscape.org/viewarticle/563417_6.

[172] Perry G. Fine, *et al.*, *Opioid-Based Management of Persistent and Breakthrough Pain*, Special Report (2009), https://www.yumpu.com/en/document/view/11409251/opioid-based-management-of-persistent-and-breakthrough-pain/9.

[173] *Id.*

message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continued:

> Pain management is a fundamental human right in all patients not only with acute postoperative pain but also in patients suffering from chronic pain. Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.[174]

240. Cephalon was one of several opioid manufacturers who collectively paid 14 of the 21 panel members who drafted the 2009 APS-AAPM opioid treatment guidelines.[175]

241. In the March 2007 article titled "Impact of Breakthrough Pain on Quality of Life in Patients with Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment with Oral Transmucosal Fentanyl Citrate,"[176] published in the nationally circulated journal *Pain Medicine*, physicians paid by Cephalon (including Webster) described the results of a Cephalon-sponsored study seeking to expand the definition of BTP to the chronic, non-cancer setting. The authors stated that the "OTFC has been shown to relieve BTP more rapidly than conventional oral, normal-release, or 'short acting' opioids" and that "[t]he purpose of [the] study was to provide a qualitative evaluation of the effect of BTP on the [quality of life] of noncancer pain patients."[177] The number-one-diagnosed cause of chronic pain in the patients studied was back pain (44%), followed by musculoskeletal pain (12%) and head pain (7%). The article cites Portenoy and recommends fentanyl for non-cancer BTP patients:

---

[174]   Mohamed A. Elkersh & Zahid H. Bajwa, *Highlights From the American Academy of Pain Medicine 24th Annual Meeting*, 2(1) Advances in Pain Management 50-52 (2008).

[175]   See Chou, *Clinical Guidelines*, *supra* n.72.

[176]   Donald R. Taylor, et al., *Impact of Breakthrough Pain on Quality of Life in Patients With Chronic, Noncancer Pain: Patient Perceptions and Effect of Treatment With Oral Transmucosal Fentanyl Citrate (OTFC, ACTIQ)*, 8(3) Pain Med. 281-88 (Mar. 2007).

[177]   *Id.*

In summary, BTP appears to be a clinically important condition in patients with **chronic noncancer pain** and is associated with an adverse impact on QoL [quality of life]. This qualitative study on the negative impact of BTP **and the potential benefits of BTP-specific therapy** suggests several domains that may be helpful in developing BTP-specific, QoL assessment tools.[178]

242.    Cephalon also sponsored, through an educational grant, the regularly published journal *Advances in Pain Management*. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik ("Passik"), Dr. Kenneth L. Kirsh ("Kirsh") and Webster, all advancing the safety and efficacy of opioids. In an article titled "Screening and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster expresses disdain for the prior 20 years of opioid phobia.

243.    In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."[179]

244.    In November 2010, Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."[180] In that article, Fine explained that the 18-month "open-label" study

---

[178]  *Id.*

[179]  Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization*, 2(1) Advances in Pain Management 9-16 (2008).

[180]  Perry G. Fine, et al., *Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment*

"assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for noncancer pain." The article acknowledges that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic noncancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[181]

245.    They conclude: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."[182]

246.    From 2000 forward, Cephalon has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Webster, Fine, Passik, Kirsh, Landy and others.

247.    Cephalon's payments to doctors have resulted in studies that support its sales but, on closer examination, are biased or irreparably flawed. For instance, and upon information and belief, the governmental whistleblower investigation into Actiq revealed that two studies touted by Cephalon had tested fewer than 28 patients and had no control group whatsoever.[183] A 2012

---

*of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study*, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).

[181]   *Id.*

[182]   *Id.*

[183]   Carreyrou, *Cephalon Used Improper Tactics*, *supra* n.160.

article evaluating the then-current status of transmucosal fentanyl tablet formulations for the treatment of BTP in cancer patients noted that clinical trials to date used varying criteria, that "the approaches taken . . . [did] not uniformly reflect clinical practice" and that "the studies ha[d] been sponsored by the manufacturer and so ha[d] potential for bias."[184]

### f.    Cephalon Failed to Report Suspicious Sales as Required

248.    The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

249.    Cephalon is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### 5.    Insys

250.    Insys manufactures, markets, sells and distributes the following prescription opioid drug:

| Subsys (fentanyl) | Fentanyl sublingual spray; semi-synthetic opioid agonist, approved in 2012. | Schedule II |
| --- | --- | --- |

251.    Subsys is indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and are tolerant to opioid therapy for their underlying persistent cancer pain."[185] The indication also specifies that "SUBSYS is intended to

---

[184]   Eric Prommer & Brandy Fleck, *Fentanyl transmucosal tablets: current status in the management of cancer-related breakthrough pain*, 2012(6) Patient Preference and Adherence 465-75 (June 25, 2012).

[185]   The indication provides that "[p]atients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 60 mg of oral morphine daily, at least 25 mcg of transdermal

be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." In addition, the indication provides that "[p]atients must remain on around-the-clock opioids when taking SUBSYS." Subsys is contraindicated for, among other ailments, the "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." It is available in 100 mcg, 200 mcg, 400 mcg, 600 mcg and 800 mcg dosage strengths.

252.    According to Dr. Andrew Kolodny, executive director of Physicians for Responsible Opioid Prescribing and chief medical officer of the Phoenix House Foundation, fentanyl products are "'the most potent and dangerous opioids on the market.'"[186]

253.    The dangers associated with Subsys are reflected by its extremely limited and specific indication, as it is approved solely for BTP in cancer patients already receiving opioids for persistent cancer-related pain.

254.    Despite Subsys' limited indication and the potent danger associated with fentanyl, Insys falsely and misleadingly marketed Subsys to doctors as an effective treatment for back pain, neck pain and other off-label pain conditions.[187] Moreover, as of June 2012, Insys defined BTP in cancer patients to include mild pain: a "flare of *mild-to*-severe pain in patients with otherwise stable persistent pain," based on a misleading citation to a paper written by Portenoy.[188] Insys trained and instructed its sales representatives to use the false definition of

---

fentanyl/hour, at least 30 mg of oral oxycodone daily, at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid daily for a week or longer."

[186]    Dina Gusovsky, *The pain killer: A drug company putting profits above patients*, CNBC (Nov. 5, 2015, 10:13 AM), http://www.cnbc.com/2015/11/04/the-deadly-drug-appeal-of-insys-pharmaceuticals. html.

[187]    *In the Matter of Insys Therapeutics, Inc.*, Notice of Unlawful Trade Practices and Proposed Resolution (July 10, 2015), https://www.documentcloud.org/documents/2195731-insysdoj.html.

[188]    Portenoy's paper, "Breakthrough pain: definition, prevalence and characteristics," which was featured

breakthrough pain and specifically to use a core visual aid, including the improper definition, whenever they detailed Subsys to a healthcare provider or provider's office.

255.    According to a 2014 article in *The New York Times*, only 1% of prescriptions for Subsys were written by oncologists. Approximately half the prescriptions were written by pain specialists, with others written by other specialists including dentists and podiatrists.[189]

### a.    The Indictment of Insys Executives

256.    On December 8, 2016, several former Insys executives were arrested and indicted for conspiring to bribe practitioners in numerous states, many of whom operated pain clinics, in order to get them to prescribe Subsys. In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for patients, most of whom were not diagnosed with cancer.[190]

257.    The indictment alleged that the former executives conspired to mislead and defraud health insurance providers, who were reluctant to approve payment for Subsys when it was prescribed for patients without cancer. In response, the former executives established a "reimbursement unit" at Insys, which was dedicated to assisting physicians by obtaining prior authorization for prescribing Subsys directly from insurers and pharmacy benefit managers.

---

in the 1990 issue of *Pain*, actually defined breakthrough pain as "a transitory increase in pain to greater than moderate intensity (that is, to an intensity of 'severe' or 'excruciating') . . . on a baseline pain of moderate intensity or less." Russell K. Portenoy & Neil A. Hagen, *Breakthrough pain: Definition, prevalence and characteristics*, 41(3) Pain 273-81 (July 1990).

[189]   Katie Thomas, *Doubts Raised About Off-Label Use of Subsys, a Strong Painkiller*, N.Y. Times (May 13, 2014), https://www.nytimes.com/2014/05/14/business/doubts-raised-about-off-label-use-of-subsys-a-strong-painkiller.html?action= click&contentCollection= Business%20Day&region= Footer& module= MoreInSection &pgtype=Blogs&_r=2.

[190]   Press Release, U.S. Attorney's Office for the District of Massachusetts, Pharmaceutical Executives Charged in Racketeering Scheme (Dec. 8, 2016), https://www.justice.gov/usao-ma/pr/pharmaceutical-executives-charged-racketeering-scheme (hereinafter "Insys Indictment Press Release"); *United States v. Babich, et al.*, No. 1:16-cr-10343-ADB, Dkt. No. 1 (D. Mass. Dec. 6, 2016), https://www.justice.gov/usao-ma/press-release/file/916681/download (hereinafter "*Insys* Indictment").

Insys' reimbursement unit employees were told to inform agents of insurers and pharmacy benefit managers that they were calling "from" or that they were "with" the doctor's office, or that they were calling "on behalf of" the doctor.

258.    The executive defendants in the indictment are Insys' former CEO and president, former vice president of sales, former national director of sales, former vice president of managed markets and several former regional sales directors. The charges include alleged violations of the federal Anti-Kickback Law, the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute and conspiracy to commit wire and mail fraud, as well as allegations of bribery and defrauding insurers.

259.    If found guilty, the executive defendants face possible sentences of up to 20 years for conspiracy to commit RICO and conspiracy to commit mail and wire fraud, as well as a fine of $250,000 or twice the amount of the pecuniary gain or loss. For the charge of conspiracy to violate the Anti-Kickback Law, the defendants face a sentence of up to five years in prison and a $25,000 fine.

260.    The indictment details a coordinated, centralized scheme by Insys to illegally drive profits. The company defrauded insurers from a call center at corporate headquarters where Insys employees, acting at the direction of Insys' former CEO and vice president of managed markets, disguised their identity and the location of their employer and lied about patient diagnoses, the type of pain being treated and the patient's course of treatment with other medication.

### b.    Insys Targeted Non-Cancer Treating Physicians and Funded False Publications and Presentations

261.    Insys targeted and bribed practitioners in a number of ways. Insys bribed Subsys prescribers through strategic hires, employing sales representatives and other employees at

practitioners' behest and with the expectation that such hires would provide inroads with key practitioners. Further, the indictment alleges that Insys bribed practitioners through a sham speakers' bureau that was purportedly intended to increase brand awareness using peer-to-peer educational lunches and dinners.

262.    The indictment alleges that in June 2012, former executives began using in-person meetings, telephone calls and texts to inform Insys sales representatives that the key to sales was using the speakers' bureau to pay practitioners to prescribe Subsys. As one of the company's vice presidents for sales texted one of his sales representatives about potential physicians for the speakers' bureau: "[t]hey do not need to be good speakers, they need to write a lot of [Subsys prescriptions]." The former Insys executives actively recruited physicians known to have questionable prescribing habits for these speakers' bureaus.[191]

263.    The indictment alleges that speakers' bureaus were often just social gatherings at high-priced restaurants involving neither education nor presentations. Frequently, they involved repeat attendees, including physicians not licensed to prescribe Subsys. Many of the speakers' bureaus had no attendees; sales representatives were instructed to falsely list names of attendees and their signatures on Insys' sign-in sheets.

264.    As set forth in the indictment, at one national speakers' bureau in or about 2014, Insys' then-vice president of sales stated:

> These [doctors] will tell you all the time, well, I've only got like eight patients with cancer. Or, I only have, like, twelve patients that are on a rapid-onset opioids [sic]. Doc, I'm not talking about any of those patients. I don't want any of those patients. That's, that's small potatoes. That's nothing. That's not what I'm here doing. I'm here selling [unintelligible] for the breakthrough pain. If I can successfully sell you the [unintelligible] for the breakthrough pain, do you have a thousand people in your practice, a thousand patients, twelve of them are currently on a rapid-onset opioids [sic]. That leaves me with at least five hundred patients that can go on this

---

[191]    *Insys* Indictment, *supra* n.190.

drug.[192]

265.    The indictment also alleges that, when agents of insurers or pharmacy benefit managers asked if a patient was being treated for BTP in cancer patients, Insys' reimbursement unit employees were instructed to answer using a written script, sometimes called "the spiel": "'The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients. The physician is treating the patient for their pain (or breakthrough pain, whichever is applicable)."'[193]

266.    The indictment alleges that Insys' former executives also tracked and internally circulated the number of planned and completed speakers' bureau events for each speaker, as well as the number of Subsys prescriptions each speaker wrote, the percentage of such prescriptions compared to those written for Subsys' competitor drugs, the total amount of honoraria paid to each speaker and, for a period of time, an explicit calculation of the ratio of return on investment for each speaker. When a speaker did not write an appropriate number of Subsys prescriptions, as determined by Insys, the number of future events for which that speaker would be paid would be reduced unless and until he or she wrote more Subsys prescriptions.

267.    In a press release issued when the indictment was announced, the Massachusetts U.S. Attorney, Carmen M. Ortiz, stated: "'I hope that today's charges send a clear message that we will continue to attack the opioid epidemic from all angles, whether it is corporate greed or street level dealing."'[194]

268.    In the same press release, the FBI Special Agent in Charge of the Boston Field Division, Harold H. Shaw, linked the allegations to the national opioid epidemic:

---

[192]   *Insys* Indictment, *supra* n.190, at 15.

[193]   *Id*. at 44.

[194]   *Insys* Indictment Press Release, *supra* n.190.

As alleged, top executives of Insys Therapeutics, Inc. paid kickbacks and committed fraud to sell a highly potent and addictive opioid that can lead to abuse and life threatening respiratory depression . . . . In doing so, they contributed to the growing opioid epidemic and placed profit before patient safety. These indictments reflect the steadfast commitment of the FBI and our law enforcement partners to confront the opioid epidemic impacting our communities, while bringing to justice those who seek to profit from fraud or other criminal acts.[195]

269.    In the press release, the Special Agent in Charge at the Defense Criminal Investigative Service in the Northeast Field Office, Craig Rupert, focused specifically on the effect the criminal activities had on members of the military: "Causing the unnecessary use of opioids by current and retired U.S. military service members shows disregard for their health and disrespect for their service to our country. . . ."[196]

### c.    Insys Failed to Report Suspicious Sales as Required

270.    The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

271.    Insys is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### 6.    Mallinckrodt

272.    Mallinckrodt manufactures, markets, sells and distributes pharmaceutical drugs and is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

---

[195] *Id.*

[196] *Id.*

273.   Among the drugs it distributes are the following prescription opioids:

| | | |
|---|---|---|
| Exalgo (hydromorphone hydrochloride extended release) | Opioid agonist indicated for opioid-tolerant patients for management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options (*e.g.*, non-opioid analgesics) are inadequate. The FDA approved the 8, 12, and 16 mg tablets of Exalgo in March 2010 and 32 mg tablet in August 2012. | Schedule II |
| Roxicodone (oxycodone hydrochloride) | Brand-name instant-release form of oxycodone hydrochloride. Indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate. Acquired from Xanodyne Pharmaceuticals in 2012. Strengths range up to 30 mg per pill. Nicknames include Roxies, blues, and stars. | Schedule II |
| Xartemis XR (oxycodone hydrochloride and acetaminophen) | The FDA approved Xartemis XR in March 2014 for the management of acute pain severe enough to require opioid treatment and in patients for whom alternative treatment options are ineffective, not tolerated or would otherwise be inadequate. It was the first extended-release oral combination of oxycodone and acetaminophen. | Schedule II |
| Methadose (methadone hydrochloride) | Branded generic product. Opioid agonist indicated for treatment of opioid addiction. | Schedule II |
| Morphine sulfate extended release | Generic product. | Schedule II |
| Fentanyl extended release | Generic product. | Schedule II |
| Fentanyl citrate | Generic product. | Schedule II |
| Oxycodone and acetaminophen | Generic product. | Schedule II |
| Hydrocodone bitartrate and acetaminophen | Generic product. | Schedule II |

| Hydromorphone hydrochloride | Generic product. | Schedule II |
| Hydromorphone hydrochloride extended release | Generic product. | Schedule II |
| Naltrexone hydrochloride | Generic product. | Schedule II |
| Oxymorphone hydrochloride | Generic product. | Schedule II |
| Methadone hydrochloride | Generic product. | Schedule II |
| Oxycodone hydrochloride | Generic product. | Schedule II |

274.  Mallinckrodt purchased Roxicodone from Xanodyne Pharmaceuticals in 2012.[197]

275.  Mallinckrodt debuted Xartemis (MNK-795) at the September 4-7, 2013 PAINWeek in Las Vegas.

### a.  Mallinckrodt Funded False Publications and Presentations

276.  Like several of the other Manufacturing Defendants, Mallinckrodt provided substantial funding to purportedly neutral organizations which disseminated false messaging about opioids.

277.  For example, until at least February 2009, Mallinckrodt provided an educational grant to Pain-Topics.org, a now-defunct website that touted itself as "a noncommercial resource for healthcare professionals, providing open access to clinical news, information, research, and education for a better understanding of evidence-based pain-management practices."[198]

---

[197] *Mallinckrodt Announces Agreement with Xanodyne to Purchase Roxicodone*, Bus. Wire (Aug. 23, 2012), http://www.businesswire.com/news/home/20120823005209/en/Mallinckrodt-Announces-Agreement- Xanodyne-Purchase-Roxicodone%C2%A.

[198] *Pain Treatment Topics, Pain-Topics.org*, https://web.archive.org/web/20070104235709 / http://www.pain-topics.org:80/ (last visited Jan. 11, 2018).

278.    Among other content, the website included a handout titled "Oxycodone Safety Handout for Patients," which advised practitioners that: "Patients' fears of opioid addiction should be dispelled." [199] The handout included several false and misleading statements concerning the risk of addiction associated with prescription opioids:

Will you become dependent on or addicted to oxycodone?

- After awhile, oxycodone causes physical dependence. That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings. These may take several days to develop.

- This is not the same as addiction, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm. Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare.[200]

279.    Additionally, the FAQ section of Pain-Topics.org contained the following false and misleading information downplaying the dangers of prescription opioid use:

**Pseudoaddiction** – has been used to describe aberrant patient behaviors that may occur when pain is undertreated (AAPM 2001). Although this diagnosis is not supported by rigorous investigation, it has been widely observed that patients with unrelieved pain may become very focused on obtaining opioid medications, and may be erroneously perceived as "drug seeking." Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated. Along with this, two related phenomena have been described in the literature (Alford et al. 2006):

   **Therapeutic dependence** – sometimes patients exhibit what is considered drug-seeking because they fear the reemergence of pain and/or withdrawal symptoms from lack of adequate medication; their ongoing quest for more analgesics is in the hopes of insuring a tolerable level of comfort.

   **Pseudo-opioid-resistance** – other patients, with adequate pain control, may continue to report pain or exaggerate its presence, as if their opioid analgesics are not working, to prevent reductions in their currently effective doses of medication.

---

[199]   Lee A. Kral & Stewart B. Leavitt, *Oxycodone Safety Handout for Patients*, Pain-Topics.Org (June 2007), http://paincommunity.org/blog/wp-content/uploads/Oxycodone/Handout.pdf.

[200]   *Id.*

> Patient anxieties about receiving inadequate pain control can be profound, resulting in demanding or aggressive behaviors that are misunderstood by healthcare practitioners and ultimately detract from the provision of adequate pain relief.[201]

280. Another document available on the website, "Commonsense Oxycodone Prescribing & Safety," falsely suggests that generic oxycodone is less prone to abuse and diversion than branded oxycodone: "Anecdotally, it has been observed that generic versions of popularly abused opioids usually are less appealing; persons buying drugs for illicit purposes prefer brand names because they are more recognizable and the generics have a lower value 'on the street,' which also makes them less alluring for drug dealers."[202]

281. In November 2016, Mallinckrodt paid Dr. Scott Gottlieb ("Gottlieb"), the new commissioner of the FDA, $22,500 for a speech in London, shortly after the U.S. presidential election.[203] Gottlieb has also received money from the Healthcare Distribution Alliance, an industry-funded organization that pushes the agenda of large pharmaceutical wholesalers, and he has often criticized efforts aimed at regulating the pharmaceutical opioid market.[204]

### b. The DEA Investigates Suspicious Orders

282. In 2008, the DEA and federal prosecutors launched an investigation into Mallinckrodt, charging that the company ignored red flags and supplied – and failed to report – suspicious orders for its generic oxycodone between 2008 and 2012.[205] The U.S. Attorney's

---

[201] *FAQs*, Pain-Topics.org, https://web.archive.org/web/20070709031530/ http://www.pain-topics.org:80/faqs/index1.php#tolerance.

[202] Lee A. Kral, *Commonsense Oxycodone Prescribing & Safety, Pain-Topics.org* (June 2007), http://paincommunity.org/blog/wp-content/uploads/OxycodoneRxSafety.pdf.

[203] Lee Fang, *Donald Trump's Pick to Oversee Big Pharma Is Addicted to Opioid-Industry Cash*, Intercept (Apr. 4, 2017, 2:15 PM), https://theintercept.com/2017/04/04/scott-gottlieb-opioid/.

[204] *Id.*

[205] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, Wash. Post (Apr. 2, 2017), https://www.washingtonpost.com/graphics/ investigations/dea-

office in Detroit, handled the case. The investigation uncovered that from 2008 to 2012, Mallinckrodt sent, for example, 500 million tablets of oxycodone into a single state, Florida – "66 percent of all oxycodone sold in the state."[206] According to the internal government documents obtained by the Washington Post, Mallinckrodt's failure to report could have resulted in "nearly 44,000 federal violations and exposed it to $2.3 billion in fines."[207]

283.    Despite learning from the DEA that generic opioids seized in a Tennessee drug operation were traceable to one of its Florida distributors, Sunrise Wholesale ("Sunrise") of Broward County, Mallinckrodt in the following six weeks sent 2.1 million tablets of oxycodone to Sunrise. In turn, Sunrise sent at least 92,400 oxycodone tablets to a single doctor over an 11-month period, who, in one day, prescribed 1,000 to a single patient.[208]

284.    According to documents obtained by the Washington Post, investigators also found "scores of alleged violations" at Mallinckrodt's plant in Hobart, New York. Those violations included the failure to keep accurate records, to document transfers of drugs and to secure narcotics.[209]

285.    During the DEA's investigation, Mallinckrodt sponsored the Healthcare Distribution Alliance (known as the Healthcare Distribution Management Association until 2016), an industry-funded organization that represents pharmaceutical distributors.[210] The HDA initiated the Ensuring Patient Access and Effective Drug Enforcement Act of 2016 (enacted

---

mallinckrodt/?utm_ term=.7ce8c975dd86.

[206]  *Id.*

[207]  *Id.*

[208]  *Id.*

[209]  *Id.*

[210]  *Sponsors: HDA's Annual Circle Sponsors*, Healthcare Distribution Alliance, https:// www.healthcaredistribution.org/hda-sponsors (last visited Jan. 11, 2018).

April 19, 2016), which requires the DEA to give notice of violations and an opportunity to comply, to pharmacies and distributors, before withdrawing licenses. This Act substantially lessened the DEA's ability to regulate manufacturers and wholesalers.[211]

286.    In May 2014, Mallinckrodt posted a video titled "Red Flags: Pharmacists Anti-Abuse Video." The video is a thinly veiled attempt to divert responsibility for the opioid epidemic away from manufacturers and wholesalers, and toward individual pharmacists. The video was sponsored by the Anti-Diversion Industry Working Group, which is composed of Cardinal Health, Actavis, McKesson, Mallinckrodt, AmerisourceBergen, and Qualitest—all of whom are conveniently missing from the list of those responsible.[212]

287.    In April 2017, Mallinckrodt plc reached an agreement with the DEA and the U.S. Attorneys for the Eastern District of Michigan and Northern District of New York to pay $35 million to resolve a probe of its distribution of its opioid medications.[213] Mallinckrodt finalized the settlement on July 11, 2017, agreeing to pay $35 million while admitting no wrongdoing.[214]

### c.    Mallinckrodt Failed to Report Suspicious Sales as Required

288.    The federal CSA imposes on all "registrants" the obligation to design and operate a system to disclose to the registrant suspicious orders of controlled substances and requires the

---

[211]  Chris McGreal, *Opioid epidemic: ex-DEA official says Congress is protecting drug makers*, Guardian (Oct. 31, 2016, 9:26 EDT), https://www. theguardian.com/us-news/2016/oct/31/opioid-epidemic-dea-official-congress-big-pharma.

[212]  Mallinckrodt Pharmaceuticals, *Red Flags: Pharmacists Anti-Abuse Video*, YouTube (May 27, 2014), https://www.youtube.com/watch?v=fdv0B210bEk&t=1s.

[213]  Linda A. Johnson, *Mallinckrodt to Pay $35M in Deal to End Feds' Opioid Probe*, U.S. News & World Report (Apr. 3, 2017, 6:47 PM), https://www.usnews.com/news/business/articles/2017-04-03/mallinckrodt-to-pay-35m-in-deal-to-end-feds-opioid-probe.

[214]  Press Release, U.S. Department of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

registrant to notify the DEA field division office in its area of any suspicious orders. "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. §1301.74(b).

289.    Mallinckrodt is a "registrant" under the federal CSA. 21 C.F.R. §1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. §823. Section 823, in turn, requires manufacturers of Schedule II controlled substances to register with the DEA.

### C.    The Wholesaler Defendants Failed to Track and Report Suspicious Sales as Required by New York and Federal Law

290.    Manufacturers rely upon distributors to distribute their drugs. The distributors serve as middlemen, sending billions of doses of opioid pain pills to pharmacists, hospitals, nursing homes and pain clinics.

291.    According to the CDC, the increased distribution of opioids directly correlates to increased overdose death rates:

# Opioid distribution and overdose death rates rise

Both rates have more than doubled since 2000.



**PRESCRIPTION OPIOID DISTRIBUTION RATE**
Grams per 100 people

14.7

6.2

**PRESCRIPTION OPIOID OVERDOSE DEATH RATE**
Deaths per 100,000 people

Death rate: 4.7
(Deaths: 14,838)

Death rate: 1.3
(Deaths: 3,785)

Fentanyl overdose deaths are excluded. The CDC removed the drug from the totals because of its growing prevalence as a street drug.

Sources: DEA, Centers for Disease Control and Prevention          THE WASHINGTON POST

### 1.     McKesson

292.    McKesson is a wholesale pharmaceutical distributor of controlled and uncontrolled prescription medications, including opioids. It is the largest drug distributor, and the fifth largest company, in the United States. It distributes pharmaceuticals through a network of distribution centers across the country. McKesson ranked fifth on the 2017 Fortune 500 list, with over $192 billion in revenues.

293.    McKesson supplies various United States pharmacies an increasing amount of oxycodone and hydrocodone pills, products frequently misused that are part of the current opioid epidemic.

294.    McKesson is a significant distributor of prescription opioids in the United States. McKesson distribution centers are required to operate in accordance with the statutory provisions

of the CSA. The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances, as that term is defined in the regulation. *See* 21 C.F.R. §1301.74(b). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. §842(a)(5) & (c)(1)(B).

295.    In or about 2007, the DEA accused McKesson of failing to report suspicious orders and launched an investigation. In 2008, McKesson entered into a settlement agreement with the DOJ and a memorandum of agreement, agreeing to pay a $13.25 million fine for failure to report suspicious orders of pharmaceutical drugs and promising to set up a monitoring system.

296.    As a result, McKesson developed a Controlled Substance Monitoring Program ("CSMP") but nevertheless failed to design and implement an effective system to detect and report "suspicious orders" for controlled substances distributed to its independent and small chain pharmacy customers – *i.e.*, orders that are unusual in their frequency, size or other patterns. McKesson continued to fail to detect and disclose suspicious orders of controlled substances. It failed to conduct adequate due diligence of its customers, failed to keep complete and accurate records in the CSMP files maintained for many of its customers and bypassed suspicious order reporting procedures set forth in the CSMP.

297.    In 2013, the DEA again began investigating reports that McKesson was failing to maintain proper controls to prevent the diversion of opioids and accused McKesson of failing to design and use an effective system to detect "suspicious orders" from pharmacies for powerful painkillers such as oxycodone, as required by the Controlled Substances Act.

298.    On January 17, 2017, in one of the most severe sanctions ever agreed to by a distributor, McKesson agreed to pay a record $150 million in fines and suspend sales of

controlled substances from distribution centers in four states to settle allegations that the company violated federal law. According to the DOJ, McKesson continued to fail to report suspicious orders between 2008 and 2012 and did not fully implement or follow the monitoring program. As part of the agreement, McKesson acknowledged that:

> at various times during the Covered Time Period, it did not identify or report to DEA certain orders placed by certain pharmacies, which should have been detected by McKesson as suspicious, in a manner fully consistent with the requirements set forth in the 2008 MOA.

### 2. Cardinal Health

299.    Cardinal Health describes itself as a global integrated healthcare services and products company. It generated $121.5 billion in total revenue during fiscal year 2016 (ended June 30, 2016). It is ranked 15th on the 2017 Fortune 500 list of top United States companies with revenues of over $121 billion.

300.    Cardinal Health has two operating segments: pharmaceutical and medical. Its pharmaceutical segment, at issue in this action, distributes branded and generic pharmaceutical, special pharmaceutical, over-the-counter and consumer products in the United States. Of Cardinal Health's $121.5 billion in revenue during fiscal year 2016, $109.1 billion was derived from the pharmaceutical operating segment.

301.    Cardinal Health is a significant distributor of prescription opioids in the United States. Cardinal Health's largest customer is CVS Health ("CVS"), which accounted for 25% of Cardinal Health's fiscal year 2016 revenue.

302.    Cardinal Health distribution centers are required to operate in accordance with the statutory provisions of the CSA and the regulations promulgated thereunder, 21 C.F.R. §1300 *et seq.* The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances as that term is defined

in the regulation. *See* 21 C.F.R. §1301.74(b). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. §842(a)(5) & (c)(1)(B).

303.   On December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA.[215]

304.   In the settlement agreement, Cardinal Health admitted, accepted and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to:

- "timely identify suspicious orders of controlled substances and inform the DEA of those orders, as required by 21 C.F.R. §1301.74(b)";

- "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels, as required by 21 C.F.R. §1301.74, including the failure to make records and reports required by the CSA or DEA's regulations for which a penalty may be imposed under 21 U.S.C. §842(a)(5)"; and

- "execute, fill, cancel, correct, file with the DEA, and otherwise handle DEA 'Form 222' order forms and their electronic equivalent for Schedule II controlled substances, as required by 21 U.S.C. §828 and 21 C.F.R. Part 1305."

305.   The settlement agreement was announced by the U.S. Attorney for the District of Maryland, Rod J. Rosenstein ("Rosenstein"), and the DEA Special Agent in Charge –

---

[215]  Earlier in 2016, CVS also agreed to pay the United States $8 million to resolve violations of the CSA by its Maryland pharmacies. According to the settlement agreement, CVS admitted that between 2008 and 2012 certain of its Maryland pharmacies dispensed oxycodone, fentanyl, hydrocodone and other pharmaceuticals in violation of the CSA because the drugs were dispensed without ensuring that the prescriptions were issued for legitimate medical purposes.

Washington Field Division, Karl C. Colder ("Colder").[216]

306.    In the press release announcing the settlement agreement, Rosenstein stated:

Pharmaceutical suppliers violate the law when they fill unusually large or frequent orders for controlled substances without notifying the DEA. . . . Abuse of pharmaceutical drugs is one of the top federal law enforcement priorities. Cases such as this one, as well as our $8 million settlement with CVS in February 2016, reflect the federal commitment to prevent the diversion of pharmaceutical drugs for illegal purposes.[217]

307.    In the press release, Colder clarified that the settlement specifically concerned

oxycodone:

DEA is responsible for ensuring that all controlled substance transactions take place within DEA's regulatory closed system. All legitimate handlers of controlled substances must maintain strict accounting for all distributions and Cardinal failed to adhere to this policy . . . . Oxycodone is a very addictive drug and failure to report suspicious orders of oxycodone is a serious matter. The civil penalty levied against Cardinal should send a strong message that all handlers of controlled substances must perform due diligence to ensure the public safety.[218]

### 3.    AmerisourceBergen

308.    AmerisourceBergen is a wholesale distributor of pharmaceuticals, including controlled substances and non-controlled prescription medications. It handles the distribution of approximately 20% of all pharmaceuticals sold and distributed in the U.S. through a network of 26 pharmaceutical distribution centers.[219] It ranked 11th on the Fortune 500 list in 2017, with over $146 billion in annual revenue.

---

[216]   Press Release, U.S. Attorney's Office for the District of Maryland, Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act (Dec. 23, 2016), https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.

[217]   *Id.*

[218]   *Id.*

[219]   *AmerisourceBergen*, Wikipedia, https://en.wikipedia.org/wiki/AmerisourceBergen (hereinafter "*AmerisourceBergen*") (last visited Jan. 11, 2018); Drug Distribution Locations – Mainland US, https://batchgeo.com/map/788de3747b01802c0171abfa8a4b5eca? (last visited Jan. 11, 2018).

309.    AmerisourceBergen is a significant distributor of prescription opioids in the United States. AmerisourceBergen distribution centers are required to operate in accordance with the statutory provisions of the CSA and the regulations promulgated thereunder, 21 C.F.R. §1300 *et seq.* The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances as that term is defined in the regulation. *See* 21 C.F.R. §1301.74(b). The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. §842(a)(5) & (c)(1)(B).

310.    In 2012, West Virginia sued AmerisourceBergen and Cardinal Health, as well as several smaller wholesalers, for numerous causes of action, including violations of the CSA, consumer credit and protection, and antitrust laws and the creation of a public nuisance. Unsealed court records from that case demonstrate that AmerisourceBergen, along with McKesson and Cardinal Health, together shipped 423 million pain pills to West Virginia between 2007 and 2012.[220] AmerisourceBergen itself shipped 80.3 million hydrocodone pills and 38.4 oxycodone pills during that time period.[221] Moreover, public documents also demonstrate that that the average dose of each tablet distributed grew substantially during that time period. The Wholesaler Defendants, including AmerisourceBergen, shipped large quantities of oxycodone and hydrocodone tablets to the state. In 2016, AmerisourceBergen agreed to settle the West Virginia lawsuit by paying $16 million to the state, with the funds set aside to fund drug treatment programs in order to respond to the opioid addiction crisis.

---

[220]   Eric Eyre, *Drug firms poured 780M painkillers into WV amid rise of overdoses*, Charleston Gazette-Mail (Dec. 17, 2016), http://www.wvgazettemail.com/news-health/20161217/drug-firms- poured-780m-painkillers-into-wv-amid-rise-of-overdoses.

[221]   *AmerisourceBergen*, *supra* n.219.

**FIRST CAUSE OF ACTION**
**DECEPTIVE ACTS AND PRACTICES**
**NEW YORK GENERAL BUSINESS LAW §349**
**(Against All Defendants)**

311.    Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

312.    Defendants' acts were consumer oriented.

313.    Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

        (a)    misrepresenting the truth about how opioids lead to addiction;

        (b)    misrepresenting that opioids improve function;

        (c)    misrepresenting that addiction risk can be managed;

        (d)    misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

        (e)    falsely claiming that withdrawal is simply managed;

        (f)    misrepresenting that increased doses pose no significant additional risks;

        (g)    falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

314.    Defendants' acts and/or practices caused actual harm to Plaintiffs.

315.    Plaintiffs have been injured as a result of Defendants' acts and/or practices.

316.    New York General Business Law § 349 declares unlawful any deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the state, and allows any person who has been injured by reason of any violation of that statute to bring an action to recover actual damages.

317.    Defendants violated New York General Business Law § 349, because they

engaged in false advertising in the conduct of a business, trade or commerce in this state.

318.   Plaintiffs and their members and beneficiaries have been injured by reason of Defendants' violation of § 349.

319.   Plaintiffs are entitled to recover their damages caused by the violation of New York General Business Law § 349 by the Defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

**SECOND CAUSE OF ACTION**
**FALSE ADVERTISING**
**NEW YORK GENERAL BUSINESS LAW §350**
**(Against All Defendants)**

320.   Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

321.   Defendants violated New York General Business Law § 350, because they engaged in false advertising in the conduct of a business, trade or commerce in this state.

322.   Defendants' acts were consumer oriented and triggered reliance by patients, physicians and others

323.   Defendants' acts and/or practices are "deceptive or misleading in a material way" and include but are not limited to:

> (a)   misrepresenting the truth about how opioids lead to addiction;

> (b)   misrepresenting that opioids improve function;

> (c)   misrepresenting that addiction risk can be managed;

> (d)   misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction;"

> (e)   falsely claiming that withdrawal is simply managed;

> (f)   misrepresenting that increased doses pose no significant additional risks;

(g)    falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

324.    Defendants' acts and/or practices caused actual harm to Plaintiffs.

325.    Plaintiffs have been injured as a result of Defendants' acts and/or practices.

326.    Plaintiffs and their members and beneficiaries have been injured by reason of Defendants' violation of § 350.

327.    Plaintiffs are entitled to recover their damages caused by violation of New York General Business Law § 349 by the Defendants in an amount to be determined at trial, subject to trebling, plus attorneys' fees.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

328.    Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

329.    Defendants have a duty to exercise reasonable care in the distribution of opioids.

330.    Defendants breached this duty by failing to take any action to prevent or reduce the distribution of the opioids.

331.    Plaintiffs have suffered significant financial consequences as a result of opioid over-prescription and addiction, including, but not limited to, having purchased (directly or indirectly), paid for, and reimbursed for opioids intended for consumption by its members, retirees, and their families; increased payments for medicines to treat HIV and/or hepatitis C related to opioid misuse, addiction, and/or overdose; and increased payments for opioid overdose reversal medication.

332.    Defendants were negligent in failing to monitor and guard against third-party

misconduct and participated and enabled such misconduct.

333.    Defendants were negligent in disclosing to Plaintiffs suspicious orders for opioids pursuant to Section 80.22 of the New York Codes, Rules and Regulations.

334.    Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

335.    Defendants are in a class of a limited number of parties that can legally manufacture and distribute opioids, which places it in a position of great trust by Plaintiffs.

336.    The trust placed in Defendants by Plaintiffs through the license to manufacture and distribute opioids that were reasonably foreseeably taken by Plaintiffs' members and beneficiaries creates a duty on behalf of Defendants to prevent the reasonably foreseeable diversion of the medications it supplies to unlawful purposes or misuse and abuse.

337.    A negligent and/or intentional violation of this trust poses distinctive and significant dangers to Plaintiffs and members and beneficiaries from the reasonably foreseeable diversion of opioids to unlawful purposes or misuse and abuse, non-legitimate medical purposes, and addiction by consumers.

338.    Defendants were negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

339.    Defendants are required to exercise a high degree of care and diligence during manufacture and distribution of prescription opioids to prevent injury to consumers the diversion of opioids to unlawful purposes or misuse and abuse, non-legitimate medical purposes, and addiction by consumers.

340.    Defendants breached their duty to exercise the degree of care, prudence,

- 115 -

watchfulness, and vigilance commensurate to the high degree of danger involved in the transaction of their business.

341.    Defendants are in exclusive control of the management of the opioids they manufactured and distributed to Plaintiffs' members and beneficiaries.

342.    Plaintiffs are without fault, and the injuries to Plaintiffs and their members and beneficiaries would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacture and distribution of opioids.

343.    Plaintiffs are entitled to recover their damages caused by Defendants' negligence in an amount to be determined at trial.

<u>**FOURTH CAUSE OF ACTION**</u>
**FRAUD**
**(Against All Defendants)**

344.    Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

345.    Defendants, individually and acting through their employees and agents, and in concert with each other, knowingly made material misrepresentations and omissions of facts to Plaintiffs to induce them to purchase, administer, and consume opioids as set forth in detail above.

346.    Defendants knew at the time that they made their misrepresentations and omissions that they were false.

347.    Defendants intended that Plaintiffs, their members and beneficiaries, physicians, patients, and/or others would rely on their misrepresentations and omissions.

348.    Plaintiffs, their members and beneficiaries, physicians, patients, and/or others reasonably relied upon Defendants' misrepresentations and omissions.

349.   In the alternate, the Defendants recklessly disregarded the falsity of their representations regarding opioids.

350.   By reason of their reliance on Defendants' misrepresentations and omissions of material fact Plaintiffs, their members and beneficiaries  suffered actual pecuniary damage.

351.   Defendants' conduct was willful, wanton, and malicious and was directed at the public generally.

352.   Plaintiffs are entitled to recover their damages caused by Defendants' fraud in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
### (Against All Defendants)

353.   Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

354.   Defendants acted willfully, wantonly, and with conscious disregard of the rights of the Plaintiffs.

355.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid purchases made by Plaintiffs.

356.   In exchange for the opioid purchases, and at the time Plaintiffs made these payments, Plaintiffs expected that Defendants had provided all of the necessary and accurate information regarding those risks and had not misrepresented any material facts regarding those risks.

357.   Defendants, through the wrongful conduct described above, have been unjustly enriched at the expense of Plaintiffs.

358.    In equity and good conscience, it would be unjust and inequitable to permit Defendants to enrich themselves at the expense of the Plaintiffs, their members and beneficiaries.

359.    By reason of the foregoing, Defendants must disgorge its unjustly acquired profits and other monetary benefits resulting from its unlawful conduct and provide restitution to the Plaintiffs.

**<u>SIXTH CAUSE OF ACTION</u>**
**Violation of The Racketeer Influenced and Corrupt Organizations Act**
**(18 U.S.C. §1962(c)-(d)) Against the Manufacturing Defendants**

360.    Plaintiffs incorporate the allegations in paragraphs 1 through 310 above as if set forth herein.

361.    Plaintiffs bring this Count on behalf of the Funds against the Manufacturing Defendants.

362.    At all relevant times, the Manufacturing Defendants have been "persons" under 18 U.S.C. §1961(3) because they are capable of holding, and do hold, a "legal or beneficial interest in property."

363.    RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

364.    RICO, among other provisions, makes it unlawful for "any person to conspire to violate" the provisions of 18 U.S.C. §1962(c) 18 U.S.C. §1962(d).

365.    As alleged herein, at all relevant times, the Manufacturing Defendants moved aggressively to capture a large portion of the opioid sales market. In so doing, the Manufacturing Defendants launched an aggressive nationwide campaign overemphasizing the under-treatment

of pain and deceptively marketing opioids as being: (i) rarely, if ever, addictive; (ii) safe and effective for the treatment of chronic long-term pain; (iii) abuse resistant or deterrent; or (iv) safe and effective for other types of pain for which the drugs were not approved. In particular, the Manufacturing Defendants, along with other entities and individuals, were employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (the "Opioid Fraud Enterprise"), whose purpose was to deceive opioid prescribers and the public into believing that Opioids were safe and effective for the treatment of long-term chronic pain, and presented minimal risk of addiction. In doing so, they sought to maximize revenues from the design, manufacture, distribution and sale of opioids which, in fact, were highly addictive and often ineffective and dangerous when used for long term, chronic and other types of pain. As a direct and proximate result of their fraudulent scheme and common course of conduct, defendants were able to extract revenues of billions of dollars. As explained in detail below, the Manufacturing Defendants' years-long misconduct violated 18 U.S.C. §1962(c) and (d).

(a)    **The Opioid Marketing Fraud Enterprise**

366.    At all relevant times, the Manufacturing Defendants, along with other individuals and entities, including unknown third parties involved in the marketing and sale of opioids, operated an "enterprise" within the meaning of 18 U.S.C. §1961(4) because they are a group of individuals associated in fact, even though they are not a collective legal entity. The opioid marketing fraud enterprise: (a) had an existence separate and distinct from each of its component entities; (b) was separate and distinct from the pattern of racketeering in which the Manufacturing Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including, but not limited to, the Manufacturing Defendants, employees and agents of the FSMB, APF, AAPM, APS, as well as other entities and individuals, including physicians.

367.     Within the opioid marketing fraud enterprise, there was a common communication network by which members exchanged information on a regular basis through the use of wires and mail. The opioid marketing fraud enterprise used this common communication network for the purpose of deceptively marketing and selling opioids to the general public. When their products were contested by other parties, the enterprise members took action to hide the scheme to continue its existence.

368.     The participants in the opioid marketing fraud enterprise were systematically linked to each other through corporate ties, contractual relationships, financial ties and continuing coordination of activities. Through the enterprise, the Manufacturing Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses. Each member of the opioid marketing fraud enterprise shared in the bounty generated by the enterprise by sharing the benefit derived from increased sales of opioids and other revenue generated by the scheme to defraud the Plaintiffs and their members and beneficiaries.

369.     The opioid marketing fraud enterprise engaged in and continues to engage in the deceptive marketing of opioids as non-addictive, as safe and effective for chronic long-term pain and for uses which have not been FDA-approved. The enterprise has engaged in such activity for the purpose of maximizing the sale and profits of opioids. To fulfill this purpose, the enterprise has advocated for and caused the over-prescription of opioids by marketing, promoting, advertising and selling opioids throughout the country and across state boundaries. Their receipt of monies from such activities consequentially affected interstate and foreign commerce. The enterprise's past and ongoing practices thus constitute a pattern of racketeering activity under 18 U.S.C. §1961(5).

370.    The opioid marketing fraud enterprise functioned by marketing and selling opioids to states, counties, other municipalities, doctors, healthcare organizations and the consuming public. Many of these opioid products are legitimate, including opioids used short-term for acute surgical and end-stage cancer pain. However, the Manufacturing Defendants as co-conspirators, through their illegal enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for the Manufacturing Defendants and the other entities and individuals associated-in-fact with the enterprise's activities through the deceptive marketing and sale of opioids.

371.    The Manufacturing Defendants participated in the operation and management of the opioid marketing fraud enterprise by directing its affairs, as described herein. While the Manufacturing Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements and financial statements.

372.    As alleged in detail above, each of the Manufacturing Defendants relentlessly promoted prescription opioids as having little to no risk of addiction, as being safe and effective for the treatment of long-term chronic pain and/or other uses for which the drugs were not approved. The Manufacturing Defendants' success in maximizing sales was due to the tight collaboration among the Manufacturing Defendants through and in collaboration with the pain foundations – a formidable partnership that marketed to hundreds of thousands of prescribers across the country, including prescribers in the Funds. The relationship was strengthened, in part, by individuals including physicians that held different leadership roles at different times across the various entities participating in the enterprise over the years.

373.   On numerous occasions, the Manufacturing Defendants funded the pain foundations' marketing efforts. The Manufacturing Defendants specifically chose to partner with the pain foundations and individual physicians to publish and otherwise disseminate misleading pro-opioid material, knowing the public and prescribers would be more receptive to statements made by what they perceived to be scholarly, neutral, third party sources.

374.   The members of the opioid marketing fraud enterprise worked together to further the enterprise, by and among the following manner and means:

(a)   jointly planning to deceptively market and manufacture opioids that were purportedly non-addictive, safe and effective for the treatment of chronic, long-term pain;

(b)   concealing the addictive qualities of the opioids from prescribers and the public;

(c)   misleading the public about the addictive quality and safety and efficacy of opioids;

(d)   otherwise misrepresenting or concealing the highly dangerous nature of opioids from prescribers and the public;

(e)   illegally marketing, selling and/or distributing opioids;

(f)   collecting revenues and profits from the sale of such products for uses for which they are unapproved, unsafe or ineffective; and

(g)   failing to report suspicious sales as required by the Controlled Substances Act.

(h)   To achieve their common goals, the Manufacturing Defendants hid from the general public the full extent of the unsafe and ineffective nature of opioids for chronic pain as described herein. The Manufacturing Defendants suppressed and/or ignored warnings from

third parties, whistleblowers and governmental entities about the addictive, unsafe and often ineffective nature of opioids.

375. The foregoing allegations support that the Manufacturing Defendants were part of an association of entities that shared a common purpose, had relationships across the various members of the enterprise and collaborated to further the goals of the enterprise for a continuous period of time. The Manufacturing Defendants knowingly and intentionally engaged in deceptive marketing practices, and incentivized pain foundations, marketing firms and physicians to do so as well.

**(b)     Mail and Wire Fraud**

376. To carry out and attempt to carry out the scheme to defraud, the Manufacturing Defendants, each of whom is a person associated in fact with the enterprise, did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).

377. Specifically, the Manufacturing Defendants have committed, conspired to commit and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§1341 and 1343), within the four years. The multiple acts of racketeering activity which the Manufacturing Defendants committed or aided and abetted in the commission of, were related to each other, and also posed a threat of continued racketeering activity. They therefore constitute a "pattern of racketeering activity."

378. The racketeering activity was made possible by the Manufacturing Defendants' regular use of the facilities, services, distribution channels and employees of the enterprise. The

Manufacturing Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

379.    In devising and executing the illegal scheme, the Manufacturing Defendants devised and knowingly carried out a material scheme and/or artifice to defraud regulators, prescribers and the public to obtain money from plaintiffs by means of materially false or fraudulent pretenses, representations, promises or omissions of material facts. For the purpose of executing the illegal scheme, the Manufacturing Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

380.    The Manufacturing Defendants' predicate acts of racketeering, 18 U.S.C. §1961(1) include, but are not limited to:

(a)    Mail Fraud: The Manufacturing Defendants violated 18 U.S.C. §1341 by sending and receiving, and by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to deceptively market, and sell the opioids by means of false pretenses, misrepresentations, promises and omissions; and

(b)    Wire Fraud: The Manufacturing Defendants violated 18 U.S.C. §1343 by transmitting and/or receiving, and by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises and omissions.

381.    The Manufacturing Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery and shipment of deceptive marketing materials by the Manufacturing Defendants and other members of the opioid marketing fraud enterprise. These materials would not have been delivered but for the Manufacturing Defendants' illegal scheme,

including, but not limited to:

> (a)    the FSMB's publication of opioid prescribing guidelines entitled "Responsible Opioid Prescribing," by Fishman;

> (b)    the APF's publication of "Exit Wounds: A Survival Guide to Pain Management for Returning Veterans & Their Families";

> (c)    the AAPM's "consensus statement" and educational programs featuring Fine;

> (d)    false or misleading communications to the public and to regulators;

> (e)    sales and marketing materials, including slide decks, presentation materials, purported guidelines, advertising, web sites, product packaging, brochures, labeling and other writings which misrepresented, falsely promoted and concealed the true nature of opioids;

> (f)    documents intended to facilitate the manufacture and sale of opioids, including bills of lading, invoices, shipping records, reports and correspondence;

> (g)    documents to process and receive payment for opioids, including invoices and receipts;

> (h)    payments to the foundations and physicians that deceptively marketed the Manufacturing Defendants' opioids;

> (i)    deposits of proceeds; and

> (j)    other documents and things, including electronic communications.

382.  The Manufacturing Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the Manufacturing Defendants made misrepresentations about opioids on their websites, YouTube

and through online ads, all of which intended to mislead prescribers and the public about the safety, efficacy and non-addictiveness of opioids.

383.    The Manufacturing Defendants also communicated by U.S. Mail, by interstate facsimile and by interstate electronic mail with various other affiliates, regional offices, divisions, distributors and other third party entities in furtherance of the scheme. The mail and wire transmissions described herein were made in furtherance of the Manufacturing Defendants' scheme and common course of conduct to deceive prescribers and consumers and lure consumers into purchasing opioids, which the Manufacturing Defendants knew or recklessly disregarded as being unsafe and ineffective for chronic long-term pain and addictive. The Manufacturing Defendants utilized mail and wire transmissions to create an extensive campaign that advertised the exact opposite message: that opioids were safe and effective and rarely if ever addictive.

384.    Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are concealed from Plaintiffs, and cannot be alleged without access to the Manufacturing Defendants' books and records. However, Plaintiffs have described the types of predicate acts of mail and/or wire fraud that occurred. The secretive nature of the enterprise's activities made its marketing tactics even more deceptive and harmful.

385.    The foregoing allegations support that the Manufacturing Defendants engaged in a pattern of racketeering activity by repeatedly engaging in wire and mail fraud to deceptively market their products through the use of both print and electronic outlets.

**(c)    Conspiracy Allegations**

386.    The Manufacturing Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C.

§1962(d), the Manufacturing Defendants conspired to violate 18 U.S.C. §1962(c), as described herein.

387.    The Manufacturing Defendants conspired to incentivize and encourage various other persons, firms and corporations, including third party entities and individuals not named as defendants in this Complaint, to carry out offenses and other acts in furtherance of the conspiracy. The Manufacturing Defendants conspired to increase or maintain revenues, increase market share and/or minimize losses for the Manufacturing Defendants and their other collaborators throughout the illegal scheme and common course of conduct. In order to achieve this goal, the Manufacturing Defendants engaged in the aforementioned predicate acts on numerous occasions. The Manufacturing Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in defectively marketing and/or selling opioids through the use of mail and wire fraud.

388.    Indeed, for the conspiracy to succeed, each of the Manufacturing Defendants had to agree to deceptively market and/or sell opioids. The unanimity of the Manufacturing Defendants' marketing tactics gave their misleading statements credence to prescribers and consumers.

389.    The Manufacturing Defendants knew and intended that government regulators, prescribers and consumers (including members and beneficiaries of the Funds), would rely on the collective material misrepresentations and omissions made by them and the other enterprise members about opioids. The Manufacturing Defendants knew and intended that consumers, including the Funds, would incur costs as a result.

390.    The Manufacturing Defendants knew that by partnering with the pain foundations

and individual physicians who carried a more neutral public image, they would be able to attribute more scientific credibility to their products, thereby increasing their sales and profits.

391.    The foregoing illustrates the Manufacturing Defendants' liability under 18 U.S.C. §1962(d) to engage in their pattern of racketeering conspired to achieve their common goal of maximizing opioid sales.

(d)    **Effect on Plaintiffs**

392.    As alleged herein, the Manufacturing Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from consumers, including the Funds, based on their misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims and methods of commission. The predicate acts were related and not isolated events. The predicate acts all had the purpose of generating significant revenue and profits for the Manufacturing Defendants at the expense of the Funds and its members and beneficiaries.

393.    The predicate acts were committed or caused to be committed by the Manufacturing Defendants through their participation in the enterprise and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining the Funds' and its members' and beneficiaries' money.

394.    As fully alleged herein, Plaintiffs relied upon representations and omissions that were made or caused by the Manufacturing Defendants. Plaintiffs' reliance is evidenced by the fact that they purchased opioids which never should have been introduced into the U.S. stream of commerce and whose use has now caused a nationwide epidemic of addiction and overdose.

395.    Plaintiffs' injuries, and those of other consumers, were proximately caused by the

Manufacturing Defendants' racketeering activity. But for the Manufacturing Defendants' misstatements and omissions and their scheme employed by the opioids marketing fraud enterprise, consumers would not have paid for opioid prescriptions for chronic pain. Though the Manufacturing Defendants' misstatements were largely directed toward opioid prescribers, Plaintiffs were directly injured by the Manufacturing Defendants' conduct because they caused the over-prescription of opioids and thus the over-purchase and over-consumption of opioids as well.

396.  Plaintiffs have suffered significant financial consequences as a result of opioid over-prescription and addiction, including, but not limited to, having purchased (directly or indirectly), paid for, and reimbursed for opioids intended for consumption by its members, retirees, and their families; increased payments for medicines to treat HIV and/or hepatitis C related to opioid misuse, addiction, and/or overdose; and increased payments for opioid overdose reversal medication.

397.  The Manufacturing Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and their members and beneficiaries, and Plaintiffs are entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly, severally, or individually in the alternative, as follows:

i.  ordering Defendants to cease manufacturing and distributing prescription opioids or prohibiting Defendants from doing so absent adequate protection against the foreseeable

diversion of prescription opioids to unlawful purposes or misuse and abuse, non-legitimate medical purposes, and addiction by consumers;

      ii.    awarding compensatory damages to Plaintiffs in an amount sufficient to fairly and completely compensate them for all their damages;

      iii.    awarding Plaintiffs treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

      iv.    awarding Plaintiffs punitive damages;

      v.    order Defendants to pay costs, losses and damages for injuries sustained by Plaintiffs, acting on their own behalf and on behalf of their members and beneficiaries, as a proximate result of the Manufacturing Defendants' and Wholesaler Defendants' unlawful conduct as set forth herein, including restitution, civil penalties, disgorgement of unjust enrichment, exemplary damages, punitive damages and attorneys' fees;

      vi.    awarding Plaintiffs their costs and disbursements, attorneys' fees, and interest; and

      vii.    granting such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: New York, New York
January 12, 2018

                              **WOLF HALDENSTEIN**
                              **ADLER FREEMAN & HERZ LLP**

                    By:   _s/ Regina M. Calcaterra_____
                         Mark C. Rifkin (MR-0904)
                         Regina M. Calcaterra (RC 8583)
                         Benjamin Y. Kaufman (BK 1863)
                         Correy A. Kamin (CK 5357)
                         270 Madison Avenue
                         New York, New York 10016
                         Telephone: (212) 545-4600
                         Facsimile: (212) 686-0114

rifkin@whafh.com
calcaterra@whafh.com
kaufman@whafh.com
kamin@whafh.com